**CITIES OF CAMPBELL and Thayer, Missouri, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Arkansas Power & Light Company, Intervenor.**

**No. 84–1017.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 30, 1984.

Decided Aug. 23, 1985.

As Amended Sept. 25, 1985.

Charles F. Wheatley, Jr., Washington, D.C., for petitioners. Don Charles Uthus, Washington, D.C., entered an appearance for petitioners.

Joseph S. Davies, Atty., F.E.R.C., Washington, D.C., for respondents. Barbara J. Weller, Deputy Sol., and Joel M. Cockrell, Atty., F.E.R.C., Washington, D.C., were on the brief, for respondent. Jerome Feit, Sol., F.E.R.C., Washington, D.C., entered an appearance for respondent.

Robert T. Hall, III, Washington, D.C., with whom Richard M. Merriman, Floyd L. Norton, IV, and Stephen L. Huntoon, Washington, D.C., were on the brief, for intervenor.

Before WRIGHT and MIKVA, Circuit Judges, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge MacKINNON.

MacKINNON, Senior Circuit Judge:

The Cities of Campbell and Thayer, Missouri ("Cities") petition under 15 U.S.C. § 3416(a)(4) for review of a Federal Energy

Regulatory Commission ("FERC" or "Commission") order affirming and adopting an initial Administrative Law Judge's decision and denying rehearing construing contracts between the Cities and the Arkansas Power & Light Company ("AP & L") as permitting unilateral rate increases under § 205 of the Federal Power Act ("FPA" or "Act"), 16 U.S.C. § 824d (1981). The issue on review is whether the Commission correctly interpreted the contracts between AP & L and the Cities. We conclude that the Commission's interpretation was correct, and affirm.

I.

In 1975, the Cities contracted to purchase electric power from the Arkansas-Missouri Power Company ("Ark-Mo"), the predecessor-in-interest of AP & L. These contracts contained identical clauses, stating:

ARTICLE III—Rate

Each month Customer will pay to the Company for all energy delivered during the preceding month an amount determined in accordance with Company's R-1 rate as now on file with the Federal Power Commission or as same may be amended from time to time. . . .

\*  \*  \*  \*  \*  \*

ARTICLE VII—Regulatory Approval

This agreement is entered into subject to the approval of regulatory agencies having jurisdiction over such company matters. *In addition, the rate, terms and conditions stated in the contract are subject to change at any time subject to the approval of governmental regulatory bodies having jurisdiction.*

(Joint Appendix (J.A.) 1601, 1602) (emphasis added).

In 1978, Ark-Mo raised the rates unilaterally by filing the new rates with the Commission under § 205 of the Federal Power Act. Although these rates represented an increase of approximately 30%, *and took effect upon filing under § 205,* the Cities did not object. Three years later, in 1981, AP & L, the successor to Ark-Mo, notified the Cities of another rate increase of 95%,

to become effective, as did the previous increase, after filing with the Commission under § 205. Upon learning of this rate increase, the Cities filed their Protest and Petition to Intervene before the Commission (J.A. 1515). The Cities did not, however, contest at this time the right of the company to increase the rates unilaterally under § 205, but requested, as they were entitled to under that section, that the Commission suspend the proposed rate filing for the maximum period of five months. The Cities filed a motion to dismiss the filing as to the Missouri Utilities Company or alternatively to intervene and suspend the rate for the maximum, five month period (J.A. 1887–1900). Petitioners did not raise the objection that the underlying contracts did not permit AP & L to make unilateral rate changes under § 205 until two months later. The Commission accepted the filing and suspended the proposed rates for five months, setting the matter for hearing (J.A. 1537–44).

On December 30, 1981, petitioners moved the Commission to modify its August 28, 1981 order to reject AP & L's proposed rate increase rather than to suspend it for five months. The rate increase, petitioners said, violated their contracts which they alleged permitted rate changes to take effect only *after* the Commission *approved* them (J.A. 1788–99). The Commission denied petitioners' motion on March 3, 1982, finding that the plain language of the contract provided for a unilateral rate change procedure that was consistent with § 205 of the Act (J.A. 186). On April 5, 1982, the Cities filed a Petition for Rehearing, which the Commission denied as untimely on May 5, 1982. The Cities subsequently on June 4, 1982 filed a Petition for Rehearing and Reconsideration of the May order. The Commission on July 6, 1982 denied the Petition for Rehearing and ordered a reconsideration of its Order of March 3, 1982. The Commission set for hearing the issue of whether extrinsic evidence indicated that the parties' intent as to the contract differed from that ascribed to them by the Commission in its interpretation of the con-

tract. The ALJ, after hearing the evidence and excluding some testimony as untimely, upheld the Commission's interpretation. The Cities appeal now from the Commission's subsequent order upholding the rate increase as consistent with the provisions of the contract.

## II.

On appeal, the Cities raise three main issues. *First,* the Cities argue that the Commission improperly applied the *Sierra-Mobile* doctrine to the contracts by finding that they permitted unilateral rate increases. *Second,* the Cities claim the Commission erred in affirming the ALJ's decision that the extrinsic evidence showed that the parties intended that changes could become effective upon unilateral filing of rate changes by the company under § 205. *Third,* the Cities claim the Commission, in approving the ALJ's exclusion from evidence of the testimony of the Cities' two witnesses, was arbitrary and capricious and denied the City a fair hearing. As a preliminary matter we address AP & L's claim that the Cities' petition for review should be dismissed because their Petition for Rehearing was untimely filed.

### A. *AP & L's Claim of Untimeliness*

■ AP & L argues that the Cities' appeal should be dismissed because the Cities did not file a Petition for Rehearing within 30 days of a final Commission order as provided by statute. *See* 16 U.S.C. § 852*l* (a). In AP & L's view, the order for reconsideration by the Commission, from which petitioners presently appeal, is not properly appealable because it merely allowed the prior order to remain and had itself no independent effect. Thus, AP & L contends that the present appeal is no more than an evasion of the statutory jurisdictional requirement of a timely rehearing petition.

AP & L's argument would have merit except for the particular circumstances of this case. Section 313(a) of the Federal Power Act provides that "[n]o proceeding to review any order of the Commission

shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon." 16 U.S.C. § 825*l* (a). Applications for rehearing may be made within 30 days after FERC's issuance of the challenged order. *Id.* The 30-day time requirement of this statute is as much a part of the jurisdictional threshold as the mandate to file for a rehearing. *Boston Gas Co. v. FERC,* 575 F.2d 975 (1st Cir.1978). *See also Dayton Power & Light Co. v. FPC,* 251 F.2d 875, 877 (D.C.Cir.1957). The dispute over the timeliness of the petition to rehear the March 3, 1982 order, however, is in fact irrelevant to this case, since the controversy was mooted by FERC's July 6, 1982 order. This court implicitly recognized this in its October 4, 1982 order in No. 83–1738, which provided that

> ... [w]ith regard to FERC's March 3, 1982 order, the petition for review is dismissed for lack of a final reviewable order. With regard to FERC's May 5, 1982 order, the petition for review is dismissed as moot. This dismissal is without prejudice to refiling after the Commission issues a final order.

*Cities of Campbell and Thayer v. FERC,* No. 83–1738 (D.C.Cir. Oct. 4, 1982) (Order). When the Cities filed its untimely application for rehearing of the Order of March 3, 1982, on April 5, 1982, it also filed a motion not only that the application be deemed timely filed or that a one-day extension be granted, but also requested in the alternative that the application for rehearing be treated as a motion for reconsideration of the March 3 order and that the March 3 order be stayed. Motions for reconsideration may be made at any time. 16 U.S.C. § 825*l* (a). On July 6, 1982, FERC announced that it had not previously considered the merits of reconsidering the March 3 order on *Mobile-Sierra* grounds. While FERC denied rehearing on the issue of timeliness of the original application (*i.e.,* denied rehearing of its May 5 order), it granted the alternative relief sought by Cities: It stayed the March 3 order pending hearing and decision on the *Mobile-Sierra*

question, the basis of the Cities' original motion to reject AP & L's rate filing.

Because the Commission agreed to reconsider its March 3 order and stayed the March 3 order, there was no final appealable order until the Commission finally rejected the Cities' motion to reject AP & L's rate filing on *Mobile-Sierra* grounds. By staying the effectiveness of its March 3 order and by granting reconsideration of that *entire* order, the Commission made clear that its administrative decision making process was still ongoing, that no final decision had yet been made, and that no rights or obligations of either party had been fixed for the interim. The March 3, 1982 order therefore was not a final, reviewable order. *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71, 91 S.Ct. 203, 209, 27 L.Ed.2d 203 (1970). The Commission's rules state that "[a]n application for rehearing of a proceeding may be filed within 30 days after the issuance of any *final* decision or order by the Commission." 18 C.F.R. § 1.34(a) (emphasis added).

The evidentiary hearing requested by the petitioners was held, and the ALJ found that they had produced no credible evidence to support the claim that the contracts provided for rate changes only pursuant to § 206 of the Federal Power Act (J.A. 1939–52). On appeal, the Commission affirmed the ALJ (J.A. 2259–60). *Arkansas Power and Light Co.*, 24 F.E.R.C. ¶ 61,306 (1983). The petitioners then sought rehearing, which the Commission

denied (J.A. 2310), and subsequently filed the instant appeal in this case. This court now takes jurisdiction after a timely filed Petition for Rehearing following an evidentiary hearing in which the entire March 3 order was reconsidered and afterwards made final.

Thus this court is not reviewing a final order for which there was no timely Petition for Rehearing. The order for which there was no timely petition, the March 3 order, was not final, and the final order, which issued after the evidentiary hearing, was the subject of a timely petition. Therefore, this court may properly reach the merits of this case.

**B.** *The Cities' Claim Regarding the Plain Language of the Contract and the* Sierra-Mobile *Doctrine*

The Cities claim that the Commission erred in concluding that the contracts allowed AP & L to raise its rates unilaterally, effective after the elapse of the notice period after the new rates were initially filed with the Commission. This procedure is consistent with § 205 of the Federal Power Act, the section the contract was intended to invoke, according to the Commission.

Under the Federal Power Act, there are two basic mechanisms for the review of electric power rates, embodied in sections 205 and 206 respectively. Under § 205 of the Act, 16 U.S.C. § 824d, the Commission must approve all rate changes.[1] The utility

---

1. 16 U.S.C. § 824d provides:

   (c) *Schedules* Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

   (d) *Notice required for rate changes* Unless the Commission otherwise orders, no change

shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public. Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect. The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

notifies the Commission when it changes a rate by filing a new rate with the Commission. The rate goes into effect immediately. The Commission may suspend the effective date of the rate for up to five months, as it did in this case. The Commission can then order that the rate be refunded from its effective date if the Commission finds the rate to be unjust or unreasonable when it later reviews the rate. Thus under the § 205 process, a proposed rate becomes effective 60 days after it is filed, but may be suspended and then refunded if it is found unjust or unreasonable upon review.

Section 206 of the Act, 16 U.S.C. § 824e, provides a different method of regulatory supervision by the Commission.[2] Under § 206, either a utility company or one of its customers may request that the Commission investigate a rate. If the Commission finds the rate to be unjust or unreasonable, it may set a rate it finds acceptable. The new rate becomes effective, however, only when the Commission issues its order to this effect. Unlike rate changes under § 205, the new rate is not effective for the period between 60 days after the request for a new rate was made and the date the rate is approved.

■ In 1956, the Supreme Court held in *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), and *United Gas Pipe Line Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), that § 205 does not permit unilateral rate increases by utilities where such increases are not permitted by the contract between utility and customer. The *Sierra-Mobile* doctrine thus defined an

---

(e) *Suspension of new rates; hearings; five month period* Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

2. 16 U.S.C. § 824e provides:

(a) Whenever the Commission, after a hearing had upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

(b) The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

arena of freedom of contract within the regulated environment of utility-consumer relations.

It follows from the *Sierra-Mobile* rulings that the right to change rates may unilaterally flow from a provision providing for that right in the service contract. Such a provision may be consistent with § 205 and utilize its procedures. Section 205 alone, however, does not provide any such right. This court articulated this interpretation in *City of Kaukauna, Wisconsin v. FERC,* 581 F.2d 993, 996–97 (D.C.Cir.1978). In that case, we held that parties could contract around the § 205 procedures, if they so chose. This procedure is obviously consistent with the *Sierra-Mobile* doctrine that § 205 standing alone does not confer on utilities in effect an extra-contractual power to raise rates and that permissible methods of increasing rates are matters for the parties to negotiate and determine when they make their contract.

■ In the case before us, therefore, it is clear the Cities *could* have entered into contract which provided for unilateral increases but that those increases would nevertheless have to be approved by the Commission *before* they became effective. The parties could have contracted to change rates in some manner consistent with § 205, but embodying additional protections for the Cities. The question here is whether the Cities and the Company *did* in fact enter into such a contract.

The relevant language in Articles III and VII of the contract, *supra,* between the Cities and AP & L states:

... Customer will pay to the Company ... an amount determined in accordance with [the] ... rate *as now on file with the ... Commission or as same may be amended from time to time....* This agreement is entered into subject to the approval of regulatory agencies having jurisdiction over such company matters. *In addition, the rate, terms and conditions stated in this contract are subject to change at any time subject to the approval of the government regulatory bodies having jurisdiction.*

(J.A. 1601–02) (emphasis added). To determine the meaning of the contract term at issue, we must interpret the foregoing provisions, and the last sentence is especially important. It is essentially the view of AP & L and the Commission that the rate may be changed at any time, but that this change must be in accordance with any laws or regulations imposed on rate changes by federal or state law. Since unilateral rate changes usually take place under § 205, the Commission in this case looked to see whether the rate change was consistent with § 205 and, finding that it was, found no violation of the contract. Under this reading, the contract and the italicized sentence in Article VII amount to a requirement that any rate change be consistent with whatever the legally-required procedures are for approval by any regulatory body with jurisdiction but that the rate may become effective *before* Commission approval. All rate changes are "subject to the approval" of the Commission in the sense that all rate changes must comply with whatever legal procedures are required, but no more than that. And under § 205, the way rates get approved is to become effective 60 days after filing, possibly get suspended, and then finally get approved or rejected after the Commission's scrutiny for fairness and reasonableness.

However, the Cities contend that when the contract provides "the rate ... [is] subject to change at any time subject to the approval of the government regulatory bodies having jurisdiction," it means that no rate change can take place unless and until *after* the rate change is actually *approved* by the Commission. In this construction, the rate change must not only be consistent with the procedures imposed by regulatory bodies with jurisdiction, the completion of these procedures is also a *condition precedent* to the effectiveness of the rate change. This construction would afford the Cities protection above the floor established by § 205.

This court's review of the Commission's interpretation of the contract is based on

the language of the contract on decisions interpreting similar language in other contracts regulated by the FPA, and on the course of conduct under the contract. Cases interpreting similar contract language support the theory the Commission advanced to distinguish contracts which permitted unilateral rate changes under § 205 and those which limit rate changes to compliance with § 206, or provide some protection in addition to § 205. According to the Commission, § 206 contracts must contain language which requires, either explicitly or implicitly, that the Commission take some action to bring the new rate into effect.

In *City of Kaukauna, Wisconsin v. FERC*, 581 F.2d 993 (D.C.Cir.1978), for example, this court found that a contract provision explicitly stating that unilateral rate increases may be sought pursuant to § 205 did not permit automatic effectuation of rate increases because it also included language requiring prior approval. That contract language stated:

> Kaukauna-Menasha [the power customer], subject to the retention of its rights of due process, including the right to participate in any rate proceeding growing out of such filing of a new rate or charge, and to participate in any applicable court proceeding for review of a regulatory determination thereon, *agrees to accept such new or changed rates as are ultimately made effective through such proceedings and review.*

*Id.* at 996 (footnote omitted). The emphasized language implies that "proceedings and review" are necessary under the contract to make a rate change effective. This contemplated process is, however, inconsistent with the usual automatic effectiveness associated with § 205.

In the same way, in *Louisiana Power & Light v. FERC*, 587 F.2d 671 (5th Cir.1979), the court found that the contract in question prohibited rate increases prior to Commission approval. There the contract stated:

> The terms and conditions of this Agreement and Rate Schedule are subject to

amendment or alteration *as a result of and in accordance with a valid applicable order of any governmental authority having jurisdiction hereof.*

*Id.* at 675. The court in *Louisiana* recognized that parties could under the *Mobile-Sierra* doctrine negotiate a contract which settled on a compromise between the fixed rate provision associated with § 206 and the unilateral rate increase contract associated with § 205. *Id.* at 676. The contract language in *Louisiana* unambiguously contemplates the Commission's taking action *before* a rate increase takes effect: the contract says that amendments may take place "as a result of ... a valid applicable order of any governmental authority." This is, moreover, the approach taken by the Supreme Court in the landmark case *FPC v. Sierra Pacific Power Co., supra,* 350 U.S. at 350, 76 S.Ct at 369. There the Court distinguishes two basic kinds of contractual agreements: those that require Commission action before a rate change takes effect and those that do not.

The same analysis applies to *Papago Tribal Utility Authority v. FERC*, 610 F.2d 914 (D.C.Cir.1979), in which this court found the contract language prohibited unilateral rate increases under § 205. That contract provided:

> The rates hereinabove set out ... are to remain in effect ... *until changed by the Federal Power Commission or other regulatory authority*, with either party hereto to be free unilaterally to take appropriate action before the Federal Power Commission or other lawful regulatory authority in connection with changes which may be desired by such party.

*Id.* at 920 (footnote omitted). The language "changed by the ... Commission" implies the Commission taking the action that changes the rates, rather than the utility company doing so unilaterally.

The same result is reached in cases decided by the Commission itself. In *Detroit Edison Co.*, 54 F.P.C. 12, 13 (1975), the Commission held that a contract providing that "rates are subject to change by order

**1188**

issued by [the] Commission" foreclosed rate changes under § 205. The contract there required a Commission order for rate changes to take place. This is another instance of a contract requiring Commission action for a rate change to become effective.

In *Indiana & Michigan Electric Co.*, 51 F.P.C. 1752 (1974), the Commission examined an electric-service contract specifying that "[s]hould any change in the [contract] rate ... *be ordered by*" the regulating agency, payment for the service "shall thereafter be made upon the basis of such new rate *as changed* and approved by" the agency. The "ordered by" and "changed by" language here once more implies that it must be the Commission that actually first changes the rate, rather than the utility, applying once again the *Sierra* analysis. Section 205, by contrast, the Commission held, is a provision for notice to the Commission of a change effected solely by the utility. "[A]n order by this Commission accepting for filing a rate increase filed pursuant to Section 205 is not approval of such an increase by this Commission." 51 F.P.C. at 1754. Such an increase was, in FERC's ruling, obtainable only under section 206(a). It should be noted, however, that the mere fact that filing a rate change under § 205 does not amount to approval tells us nothing about whether the parties intended in their contract to negate the pre-approval rate effectuation available under § 205.

The contract language in *Appalachian Power Co.*, 57 F.P.C. 1140, 1141 (1977), also implied that rates were to be changed only through Commission action:

[A]ny party may at any time or from time to time, unilaterally take any action before or with such authorities [having jurisdiction] with respect to any term, or conditions of this Agreement that it deems desirable and in such event the terms and conditions under which service shall be rendered here under shall be the terms and conditions authorized by such authority.

Such contract provision required a party who wanted to change a rate to "take ... action before or with [the] authorities" having jurisdiction. This clearly implies going to the appropriate authority and asking them to take the action necessary to bring about the rate change. This is not the procedure contemplated in § 205, under which the utility itself may file a rate change which becomes effective (subject to refund) before the Commission approves it, and the Commission so ruled.

Most recently, in *Cities of Bethany v. FERC*, 727 F.2d 1131 (D.C.Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 293, 83 L.Ed.2d 229 (1984), this court considered a contract somewhat similar to that here under examination. The *Bethany* contract specified rates for the first ten years of the contract and included an "agreement to agree" on rates for the second ten year period "subject to the approval of the regulatory body." The contract provided:

The term of this agreement shall be for a period of 20 years from and after the effective date hereunder; provided however, that the rates and charges for service hereinbefore set forth shall apply only during the first ten years of the period, and the rates and charges for the second ten years of the period shall be mutually agreed to by both parties subject to the approval of the regulatory body or bodies as may have jurisdiction thereof.

*Id.* at 1141 (footnote omitted). When the parties failed to reach an agreement for the second ten year period, the utility filed for a unilateral rate increase under § 205. The court stated that "[o]pen rate terms in contracts may properly be interpreted to permit a utility unilaterally to file rates under section 205," *id.* at 1143, and in ruling on the validity of this procedure stated: "we hold that the contract's rate-setting provision contemplates section 205 filings ..." under such circumstances, *id.* at 1144. The court observed further that the language in the contract providing that rates shall be agreed upon by the parties "subject to the approval of the

regulatory body" is also consistent with section 205 filings. FERC's authority under section 205 to suspend and investigate rates filed under section 205 has been interpreted as the authority to "approve" rates.

727 F.2d at 1143–44 (citing *City of Piqua, Ohio v. FERC*, 610 F.2d 950, 954–55) (D.C. Cir.1979)) ("Filing under section 205(d) allowed the Commission to review the agreement to insure its reasonableness.... [And] the Commission, in finding the Agreement reasonable ... merely approved the rate change....").

The contractual language in the instant case may readily be interpreted in light of the above precedents. The issue is whether the language providing that "the rate, terms and conditions stated in this contract are subject to change at anytime subject to the approval of the governmental regulatory bodies having jurisdiction" precludes the Company's unilateral rate filing under § 205.

We note first that this language has nothing that explicitly requires that rate changes occur only at the initiative of or subsequent to some action taken by the Commission, as did the contractual language emphasized in the cases above. The language in the instant contract does not refer to rate changes ordered by, changed by, made effective through, or made as a result of any Commission action taken before the rate change would become effective. Neither is there any language which implies such a requirement. The contract here merely states that rate changes are "subject to the approval of the government regulatory bodies having jurisdiction." Not only does the contract *not* contain the sort of language past cases have held denotes § 206 protections, it *does* contain language almost identical to language this

court has already explicitly ruled in *Bethany* can be consistent with § 205 rate changes.[3]

It is difficult to see, moreover, *why* the ordinary meaning of this language must be interpreted to require Commission approval *prior* to any effective rate change. In ordinary language, to say that something may exist or be done *subject to* some other event does not necessarily mean the latter is a necessary condition to the former: Mountains are subject to erosion, the flesh is subject to "heartache and a thousand natural shocks," grass is subject to getting rained on, and rate changes are subject to the approval of the Commission. Nothing in this language suggests that erosion must precede mountains, that the trials of the human condition must precede our corporeal state, or that the approval of the Commission must precede a rate change. The phrase "subject to" simply does not have the meaning petitioners want to attribute to it. To achieve the effect of either a condition precedent or subsequent by using the phrase "subject to," one must couple it to some language denoting a procedure that by itself implies prior or subsequent action, respectively. As Chief Justice Marshall remarked as to whether a provision states a condition subsequent or precedent, "the question is always one of intention." *Finlay v. King*, 28 U.S. (3 Pet.) 346, 374, 7 L.Ed. 701 (1830); *see also Atlantic Pacific Oil Co. v. Gas Development Co.*, 105 Mont. 1, 69 P.2d 750, 762 (1937) (cases cited). The requirement of "approval," by itself, however, does not get the contract any closer to § 206 or to any protection beyond that afforded by § 205. Both *City of Piqua, Ohio v. FERC, supra*, and *Cities of Bethany v. FERC, supra*, treat the completion of the § 205 procedure as "approval" of a rate change by the Commission.

---

3. This court in *Bethany* read the contract in that case as involving two requirements for the second ten years covered by the contract. First, the rate changes would be mutually agreed upon, and second they would be approved by the Commission. This court decided a § 205 rate change was consistent with these two requirements because, first, failure to agree rendered the contract an open rate contract and second, that the condition that any change was "subject to the approval" of the Commission was satisfied by § 205 procedure. Both of these findings were necessary to this court's holding that the § 205 rate change was consistent with the contract. 727 F.2d at 1143–44.

In *Bethany* the context of an open rate contract made the meaning of "subject to" clear. Here Article III of the contract reveals that the § 206 procedure was not contemplated, and that the "subject to" language does not require a § 206 procedure to change rates. In Article III the contract states:

> Each month Customer will pay to the Company for all energy delivered during the preceding month an amount determined in accordance with Company's R–1 rate *as now on file with the Federal Power Commission or as same may be amended from time to time.*

(Emphasis added.) This "on file" language strongly suggests that the standard § 205 procedure, in which rates are changed when the utility company amends its filing with the Commission, was contemplated by the parties. Taken together, this language and the "subject to ... approval" language provide that the appropriate rate is the one *on file.* Under the contract and § 205, the company may unilaterally change the rate on file. However, the Commission's approval, *i.e.,* its ability to suspend and investigate rates, is not affected by the contract.

This court recognized in *Bethany,* 727 F.2d at 1144, that the Commission's "tendency in recent years [has been] to require an explicit expression in private contracts of the parties' intention to permit unilateral filings under section 205." *See, e.g., Public Service Co. of New Mexico v. FERC,* 628 F.2d 1267, 1270 (10th Cir.1980), *cert. denied,* 451 U.S. 907, 101 S.Ct. 1974, 68 L.Ed.2d 295 (1981).[4] This tendency, however, has not yet reached so far as to require § 206 procedures under a contract like that in the instant case where there is nothing to suggest that the parties intended such result.

The protracted interpretation of the contract necessary to resolve this case, however, could have been avoided had the parties drafted an agreement with clear and direct language in the first place.[5] This court should not find itself compelled to review contract language that is merely a variation of that reviewed here when all question can be avoided by careful legal draftsmanship in contracts drafted in the future.

In light of past precedents on the interpretation of similar contracts, and the ordinary meaning of the language in the contract before us, therefore, we find, as the Commission concluded, that the contracts between AP & L and the Cities did permit unilateral rate changes under § 205.

## C. *The Cities' Claims Regarding the Extrinsic Evidence*

The Cities also contend that FERC erred in finding that the extrinsic evidence considered at the evidentiary hearing did not support the Cities', but rather the Commission's, interpretation of the contract. A review of evidence, however, leads to an affirmance of the Commission's holding.

The testimony of the Cities' witnesses at the evidentiary hearing was accurately characterized by the ALJ as

> lay interpretations of the contracts made years after their negotiation and execution and not related to any specific statements or actions concerning the intent of the negotiators for the Cities at the time the contracts were executed.

(J.A. 1945.) The witnesses clearly did not understand the Commission's regulatory process; they were hardly in a position to testify as to the meaning of the contract in light of that process (J.A. 1946). *See* J.A. 65–67, 68–69, 73, 139, 241–43. The specif-

---

4. Even *New Mexico,* however, involved a contract with language contemplating only rate changes "ordered ... by ... [the] regulatory body." 628 F.2d at 1270.

5. The FERC has issued a proposed rule which provides such language, *i.e.:*
   > Nothing contained herein shall be construed as affecting in any way the right of the party furnishing service under this rate schedule to unilaterally make application to the Federal Power Commission for a change in rates under Section 205 of the Federal Power Act and pursuant to the Commission's Rules and Regulations, promulgated thereunder.

   Order No. 541–A, 18 C.F.R. § 35.1(d)(2).

ics of their testimony only reflect this lack of knowledge on their part. It is inconceivable that their testimony could be held as establishing a meaning of the contract at variance with the natural interpretation based on the language of the contract itself.

What the extrinsic evidence did tend to show was that the Cities intended a contract that allowed for rate changes under § 205. In 1978, Ark-Mo increased the Cities' rates by approximately 30% under the § 205 procedure. The Cities did not protest. Campbell Witness Weeks later explained that the City did not protest the 1978 increase because it "did not seem much higher than the general rate of inflation" (J.A. 1585–86). On cross-examination it turned out, however, that the witness had no idea what this rate of inflation was. Thayer Witness French testified his city did not intervene or protest the 1978 increase because his city was not an Ark-Mo customer at the time (J.A. 1628–29). This turned out to be false (J.A. 1726–28). On redirect examination, Thayer tacked and said his city in fact did not protest the increase because it was so small (J.A. 147–52). It represented a "mere" 30% increase in price. The ALJ was not overwhelmed by the extrinsic evidence (J.A. 1948).

■ The extrinsic evidence also included evidence of past dealings under the contract. As this court recognized in *Bethany,* prior course of dealing is probative of the parties' intent as to the terms of a contract. *Bethany, supra,* 727 F.2d at 1144. In *Bethany* the conduct covered a number of years while here the conduct involves only one rate increase under § 205. But one completed transaction under a contract is hardly *de minimis,* especially in a case like this where there is no credible explanation for the Cities' failure to protest except a claimed lack of any knowledge or belief that they had a right to protest a § 205 rate increase as violating the contract. If the contract actually means what the Cities claim, the Cities' failure to protest the 1978 increase is hard to explain: such an interpretation suggests the Cities just decided not to exercise a right it knew it had simply because it considered a 30% increase in price either small or fair. While one transaction under a contract is not dispositive, it is relevant evidence supporting the Commission's ruling.

■ The Commission also acted properly in excluding as untimely other evidence proffered by the petitioners. The ALJ at the evidentiary rehearing excluded revised testimony offered by Thayer and denied that city's motion to reopen to accept an affidavit submitted by City Attorney Hass. The ALJ excluded the testimony because the petitioners offered no explanation for its untimeliness and because it contradicted the pre-filed testimony of Mr. French. He also refused to certify his ruling to the Commission (J.A. 111A–13A). The petitioners subsequently moved under Rule 716 of the Commission's revised procedural rules, 18 C.F.R. § 385.716 (1984), to reopen the record to receive the testimony. The ALJ denied this motion, saying the proper course was to appeal his earlier refusal to accept the testimony to the Commission under Rule 715(c), 18 C.F.R. § 385.715(c) (1984). Under Rule 715(c)(2), 18 C.F.R. § 385.715(c)(2), this appeal was due within seven days of the judge's refusal to certify his ruling. The petitioners missed this deadline and were properly foreclosed from pursuing the question of the testimony further. The Commission's valid procedural rules, with which petitioner, without explanation, failed to comply, should not now be set aside. *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543, 98 S.Ct. 1197, 1211, 55 L.Ed.2d 460 (1978).

■ Reopening an evidentiary hearing is a matter of agency discretion, *City of Wausau, Wisconsin v. United States,* 703 F.2d 1042, 1044 (7th Cir.1983), and is reserved for extraordinary circumstances, *Bowman Transportation Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 296, 95 S.Ct. 438, 447, 42 L.Ed.2d 447 (1974). This is hardly such a case. The duty of the Commission to inquire into all relevant facts, moreover, does not extend

to holding an evidentiary hearing open indefinitely, so as to allow a party to submit untimely and contradictory, not to mention incredible, testimony, as if in an attempt to assist a party in figuring out what its story really is. The ALJ properly refused to admit the untimely and contradictory testimony.

In this case we find a contract that has none of the language that in other cases have been taken to require § 206 procedures for rate changes, that following its ordinary meaning unambiguously allows for rate changes under § 205, and for which what history of transactions under the contract we have indicates that the parties assumed § 205 rate increases were permitted. Even if this court was not bound "to accord great weight to the judgment of the expert agency that deals with agreements of this sort in a daily basis," as we are, *Kansas Cities v. FERC,* 723 F.2d 82, 87 (D.C.Cir.1983), (*cited in Atlanta Gas Light Co. v. FERC,* 756 F.2d 191, 198 (D.C. Cir.1985)), the Commission in this case should nevertheless be upheld.

For the reasons stated above, the orders of the Commission are affirmed.

*Judgment accordingly.*