United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued April 13, 1998 Decided July 10, 1998

 No. 97-1414

 David F. Power, 

 Petitioner

 v.

 Federal Labor Relations Authority, 

 Respondent

 Pension Benefit Guaranty Corporation, 

 Intervenor

 On Petition for Review of an Order of the 

 Federal Labor Relations Authority

 Steven J. Silverberg argued the cause for the petitioner.

 Ann M. Boehm, Attorney, Federal Labor Relations Au-
thority, argued the cause for the respondent. David M. 
Smith, Solicitor, and William R. Tobey, Deputy Solicitor, 
Federal Labor Relations Authority, were on brief. Pamela 


P. Johnson, Attorney, Federal Labor Relations Authority, 
entered an appearance.

 Nancy S. Heermans, Counsel, Pension Benefit Guaranty 
Corporation, argued the cause for the intervenor. James J. 
Keightley, General Counsel, Terrence M. Deneen, Principal 
Deputy General Counsel, and Patrick S. Menasco, Attorney, 
Pension Benefit Guaranty Corporation, were on brief.

 Before: Henderson, Rogers and Garland, Circuit Judges.

 Opinion for the court filed by Circuit Judge Henderson.

 Karen LeCraft Henderson, Circuit Judge: David F. Pow-
er petitions the court to review an order of the Federal Labor 
Relations Authority (FLRA or Authority), Pension Benefit 
Guar. Corp., 52 F.L.R.A. No. 132 (April 30, 1997), dismissing 
his wrongful termination claim against his former employer, 
the Pension Benefit Guaranty Corporation (PBGC). In Pen-
sion Benefit Guar. Corp. v. FLRA, we remanded to the 
FLRA to explain more adequately its decision in favor of 
Power. 967 F.2d 658, 670 (D.C. Cir. 1992). We also directed 
the FLRA to compare Power to another PBGC employee 
whose transgressions were "at least comparable" to Power's. 
Id. For the reasons set forth below, we uphold the FLRA's 
order of dismissal.

 I.

 In the late 1980s Power was employed as a lawyer in the 
Office of General Counsel (OGC) of the PBGC and served as 
president of Local Chapter 211 of the National Treasury 
Employees Union (NTEU). As we earlier recounted, Power 
was fired from his position at PBGC due to "many incidents 
of ... insubordinate conduct." Pension Benefit Guar. Corp., 
967 F.2d at 660.1 While not exhaustive, examples of Power's 

__________
 1 The facts underlying this appeal have been detailed in earlier 
incarnations. See Pension Benefit Guar. Corp. v. FLRA, 967 F.2d 
658, 659-65 (D.C. Cir. 1992); Pension Benefit Guar. Corp., 52 
F.L.R.A. No. 132, slip op. at 1-9 (April 30, 1997); Pension Benefit 
Guar. Corp., No. 3-CA-90456, slip op. at 1-9 (July 19, 1994) (ALJ 

insubordination include his (1) repeated refusal to respond 
properly to a routine, supervisory request for a representa-
tive sample of his writing, id. at 659-60; (2) "inexcusable" 
failure to follow a "concurrence matrix" used by the office to 
ensure the consistency of its policies, id. at 660 (quoting a 
warning memorandum sent to Power by the assistant general 
counsel); (3) repeated refusal to accept messages from an 
assistant general counsel, including one scheduling a meeting 
to discuss the status of Power's cases, id. at 660-62; (4) 
repeated refusal to obey a management order to return the 
printout of an employee survey regarding computer usage 
that Power had obtained and kept without the knowledge or 
consent of authorized agency personnel, id. at 661; (5) threat 
directed to Donald Morrison, a fellow employee who ran for 
vice president of Local 211, id.; and (6) refusal to answer 
questions about the Morrison threat during an investigatory 
interview, id. at 661-62. Power's conduct eventually led the 
assistant general counsel to conclude that discharge was 
appropriate. Id. at 662. The General Counsel agreed "after 
weighing Power's record of service with the agency and his 
'considerable legal talents' against his 'demonstrated lack of 
judgment and integrity,' his 'persistent pattern of flouting 
supervision' and 'the need for supervisory review to ensure 
the consistency of agency decisions,' his 'disregard for ... 
[Morrison's] statutory rights,' his 'complete absence of re-
morse,' and his 'instigation of other employees to violate 
established policies.' " Id. The General Counsel concluded 
that Power "was either 'unable or unwilling to conform his 
behavior to [the] high standard' of conduct expected of an 
employee in Power's position." Id.

 Power enlisted the assistance of the NTEU, which began 
an unfair labor practice claim on Power's behalf, alleging that 
Power had been discharged in violation of the Federal Service 
Labor-Management Relations Statute (FSLMRS), 5 U.S.C. 

__________
Decision); Pension Benefit Guar. Corp., 47 F.L.R.A. No. 52, slip op. 
at 1-4 (May 7, 1993); Pension Benefit Guar. Corp., 39 F.L.R.A. 
905, 905-21 (1991); Pension Benefit Guar. Corp., 39 F.L.R.A. 935, 
935-60 (1990) (ALJ Decision).


s 7116(a)(1) and (a)(2) (making it "unfair labor practice" to 
discriminate against employee based on union affiliation), for 
engaging in protected activity under 5 U.S.C. s 7102 (provid-
ing each employee with "right" to affiliate with labor organi-
zation "without fear of penalty or reprisal" and "to act for a 
labor organization in the capacity of a representative"). Pow-
er claimed that his refusal to provide a writing sample was a 
"protected activity" because he was "actively engaged in a 
grievance over the exact subject matter for which the writing 
sample was requested." Pet'r Br. at 18-19. Power also 
asserted that he was engaged in "protected activity" when he 
obtained the computer survey data, refused to return it and 
refused to answer questions about it because "[a]ll of these 
actions were undertaken solely for the purpose of represent-
ing the interest of the bargaining unit in negotiations with 
PBGC over ergonomic furniture." Id. at 19.

 The Administrative Law Judge (ALJ) who heard the claim 
recommended dismissal. Pension Benefit Guar. Corp., 39 
F.L.R.A. 935, 965 (1990). The ALJ credited the testimony of 
PBGC managers who stated that union activity played no 
part in their decision to terminate Power. The ALJ conclud-
ed that Power had failed to establish his allegations by a 
preponderance of the evidence. Id. at 960-65. The FLRA 
reversed, concluding that PBGC had wrongfully discharged 
Power because of his union affiliation and activities. Pension 
Benefit Guar. Corp., 39 F.L.R.A. 905, 931 (1991).

 PBGC appealed and we reversed, remanding the matter to 
the FLRA for further consideration. We began by noting:

 We need not decide whether the FLRA made out a 
 prima facie case [under the unlawful discrimination 
 framework set forth in Letterkenny Army Depot, 35 
 F.L.R.A. 113 (1990)] because we believe that PBGC 
 demonstrated that it would have fired Power absent ... 
 union animus. The FLRA conceded "that Power en-
 gaged in insubordinate acts," see 39 F.L.R.A. at 930, and 
 implicit in this concession is a recognition that PBGC had 
 a "legitimate justification for its action." Letterkenny, 35 
 F.L.R.A. at 118.


Pension Benefit Guar. Corp., 967 F.2d at 666. Under the 
Letterkenny framework,2 we next examined whether PBGC 
demonstrated--as it must--that it would have discharged 
Power "even in the absence of protected activity." Letterken-
ny, 35 F.L.R.A. at 118. We noted that the analysis required 
a comparison of the PBGC punishments meted out to other 
similarly situated employees. Pension Benefit Guar. Corp., 
967 F.2d at 666. We determined, however, that the FLRA's 
analysis of the "similarly situated status of the employees 
being compared" was "inadequately explained." Id. at 667. 
Specifically, we noted that the FLRA's comparison of Power 
to two other employees, employee #1 and employee #6, was 
insufficiently explained.3 Id. at 668-70. We specifically "re-
ject[ed] the FLRA's finding that the conduct of employee #1 
and of Power was 'at least comparable' as unsupported by 
substantial evidence on the record as a whole." Id. at 667 
(citing 5 U.S.C. s 7123(c); Universal Camera Corp. v. 

__________
 2 "[T]he FLRA General Counsel makes out a prima facie case 
of discrimination [under Letterkenny] if it shows by a preponder-
ance of the evidence that: '(1) the employee against whom the 
alleged discriminatory action was taken was engaged in protected 
activity; and (2) such activity was a motivating factor in the 
agency's treatment of the employee in connection with hiring, 
tenure, promotion, or other conditions of employment.' " Pension 
Benefit Guar. Corp., 967 F.2d at 666 (quoting Letterkenny, 35 
F.L.R.A. at 118). Once the prima facie showing is made, the 
employer can establish that (1) there was a "legitimate justification" 
for the action and (2) the same action would have been taken even 
in the absence of protected activity. Letterkenny, 35 F.L.R.A. at 
118.

 3 In addition, we "question[ed] the FLRA's attempt to distin-
guish the case of employee #8 ..., a GS-12 auditor discharged for 
insubordination, on the ground that he, unlike Power, received 
progressive discipline. Power did receive numerous warnings and 
had more than ample notice that his conduct was unacceptable." 
Pension Benefit Guar. Corp., 967 F.2d at 670 n.15. We were "also 
troubled by the FLRA's reliance [in its disparate treatment analy-
sis] on PBGC's failure to discharge three of its employees for 
physical assaults and obscene gestures" who "were neither lawyers 
nor OGC employees." Id. at 668-69.

NLRB, 340 U.S. 474, 490 (1951)).4 With respect to employee 
#6, we "question[ed] the FLRA's contention ... that employ-
ee #6 is not comparable" in that employee #6 was also an 
OGC lawyer, he "repeatedly dealt directly with PBGC's Office 
of the Executive Director, urging it to take positions that had 
not been approved by the General Counsel and were in some 
instances contrary to the General Counsel's positions" and he 
was given the choice to resign or be terminated. Id. at 669. 
We explained:

 We view [employee #6's] transgressions as 'at least 
 comparable' to Power's failure to follow the concurrence 
 matrix. We further note that employee #6 did not 
 engage in the multiple types of insubordination Power 
 did. That PBGC did not offer employee #6 a suspension 
 but instead sought his removal may be further evidence 
 that Power did not receive disparate treatment. In any 
 event, the FLRA made no mention of employee #6, an 
 employee whose situation, we conclude, was in some 
 respects analogous to Power's.

Id. at 669-70. Accordingly, we concluded that "the FLRA 
failed to define 'similarly situated' in conducting its disparate 

__________
 4 We held:

 The record demonstrates that, unlike employee #1 who had 
 received no warnings before the imposition of the disciplinary 
 sanction, Power had received numerous verbal warnings. Nev-
 ertheless, Power continued his insubordinate conduct. Indeed, 
 the record further indicates that even after the investigatory 
 interview, at which time Power had knowledge that his conduct 
 was being closely scrutinized, he continued to refuse to follow 
 the concurrence matrix and he continued to delete CEO mes-
 sages without reading them. The FLRA's decision ignores this 
 critical difference between employee #1's conduct and Power's 
 conduct.

Pension Benefit Guar. Corp., 967 F.2d at 667. Moreover, we noted 
that employee #1's supervisors "retained sufficient confidence in 
him to grant him a second chance" whereas "two management 
officials who the FLRA concedes did not have a union animus, 
testified that Power could not return to the office as an effective 
employee." Id. at 668.

treatment analysis" and remanded "for proceedings not in-
consistent with this opinion, including the direction that the 
FLRA consider employee #6 in conducting its disparate 
treatment analysis." Id. at 670. Following our directive, on 
remand the FLRA articulated its criteria for determining 
whether an employee has been treated differently from simi-
larly situated employees:

 In making such a determination, the Authority considers 
 the totality of the facts and circumstances of the case. 
 The Authority compares, among other things, the consis-
 tency of treatment received by an employee who engaged 
 in protected activity with that received by other employ-
 ees: (1) from the same supervisor, and (2) in the work-
 place as a whole.

 Moreover, in determining whether employees are simi-
 larly situated in circumstances where an adverse or 
 disciplinary action was taken against an employee who 
 engaged in protected activity and against one who did 
 not, we find that it is relevant to compare: (1) the nature 
 of the misconduct; (2) the positions the employees occu-
 pied; (3) the employees' past disciplinary records; and 
 (4) the extent to which employees were previously 
 warned that their conduct may result in discipline. We 
 also find that it is appropriate to examine the elements 
 listed in Douglas v. Veterans Administration, 5 
 [M.S.P.B.] 280, 305-06 (1981) (Douglas) that are relevant 
 to a particular adverse action decision and the extent to 
 which a respondent consistently relied on the Douglas 
 elements, or any other factors, when imposing adverse or 
 disciplinary actions. We note that the weight given to 
 the above-noted factors may vary with the circumstances 
 presented in a specific case.

Pension Benefit Guar. Corp., 47 F.L.R.A. No. 52, slip op. at 5 
(May 7, 1993) (internal citations omitted). The FLRA, how-
ever, subsequently sent the case back to the ALJ because it 
found the record inadequate for it to make the specific 
determinations with respect to Power required by this court. 
Id. at 5-7. The FLRA directed the ALJ to adduce "addition-


al evidence to decide whether Power was similarly situated to 
Employees Nos. 1, 6, 7, 9 and/or 10 and, based on the 
evidence ... determine ... whether Power was subject to 
disparate treatment." Id. at 6-7.

 On remand, the ALJ conducted a one-day hearing during 
which "all parties were afforded the full opportunity to be 
heard, to examine and cross-examine witnesses, and to intro-
duce evidence bearing on the issues set forth in the [FLRA's] 
remand." Pension Benefit Guar. Corp., No. 3-CA-90456, slip 
op. at 4 (July 19, 1994). "Upon the basis of the entire record, 
including ... observation of the witnesses and their demean-
or," the ALJ concluded, once again, that "I cannot find that 
Mr. Power was subjected to disparate treatment." Id. at 4, 
11. Specifically, the ALJ found that employee #6 and Power 
"were similarly situated," and "[i]nasmuch as both Employee 
No. 6 and Mr. Power were given like penalties for the same 
indiscretions, I find that Mr. Power was not treated different-
ly than Employee No. 6." Id. at 10. In addition, "[w]ith 
respect to Employee No. 1, in agreement with the Circuit 
Court of Appeals for the District of Columbia, I find that 
Employee No. 1 and Mr. Power were not similarly situated." 
Id. And finally,

 [T]urning to Employee [sic] Nos. 7, 9 and 10 ... I cannot 
 find that they are similarly situated to Mr. Power. In 
 reaching this conclusion I note, among other things, the 
 fact that they are not lawyers, they do not work in the 
 same department under the same supervision, the type of 
 misconduct they were involved in, i.e., fighting as op-
 posed to insubordination, the respective grades held by 
 the employees and Mr. Power, and the responsibilities 
 imposed upon Mr. Power as an independent operator 
 representing Respondent in the legal arena.

Id. at 11. The FLRA affirmed the ALJ:

 [W]e find Power similarly situated and treated compar-
 ably to Employees Nos. 6 and 8,5 who were also separat-

__________
 5 While the ALJ did not adduce further evidence with respect 
to Employee No. 8, the FLRA determined that the record was 
sufficient to allow it to again compare Employee No. 8 with Power.

 ed from Federal service. As to Employee No. 1, al-
 though Power and Employee No. 1 were both attorneys 
 and engaged in somewhat comparable misconduct, we 
 find that significant differences between them rebuts 
 [sic] the conclusion that Power was disparately treated. 
 We also find that Power was not similarly situated to 
 Employees Nos. 7, 9, and 10 who, like Employee No. 1, 
 received lesser sanctions than Power. We therefore find 
 that Power was not treated disparately by PBGC, and 
 that PBGC would have taken the same action even in the 
 absence of Power's protected activity.

Pension Benefit Guar. Corp., 52 F.L.R.A., slip op. at 27-28.

 Power now petitions this Court to reverse the FLRA's 
April 30, 1997 decision. He requests that the PBGC be 
ordered to offer him immediate reinstatement to his former 
(or a comparable) position with full backpay and interest and 
that it be instructed to expunge from its records all refer-
ences to his removal, to post a notice to all employees 
admitting its error and to pay attorney's fees.

 Power also claims that, in any event, the FLRA's decision 
should be set aside because, on remand, one of the two voting 
FLRA panel members, Donald S. Wasserman, should have 
recused himself based on an incident with Power when both 
were employed by the American Federation of State, County 
and Municipal Employees, AFL-CIO (AFSCME). After 
PBGC terminated Power, he secured a position with 
AFSCME as a labor economist in the research department. 
Power Decl. p 3. At that time, Wasserman was the director 
of research and collective bargaining services at AFSCME. 
Wasserman Decl. p 3. Power claims that the incident oc-
curred during a meeting in Wasserman's office while they 
were discussing a letter that Power drafted. He claims that 
Wasserman criticized the letter and then reacted angrily to 
Power's explanation which Wasserman viewed as condescend-
ing, disrespectful and insubordinate. Power Decl. pp 15, 16. 
Soon after the meeting he was informed that his employment 
would not continue past the probationary period and he now 
alleges Wasserman had a role in that termination decision. 


Power Decl. pp 19-20. For his part, Wasserman declares 
that he "played no part, directly or indirectly, in the decision 
to terminate" Power, that his decision as an FLRA member 
"was based solely upon my consideration of the facts of the 
applicable law" and that the earlier incident "in no way 
affected my decision in the case, nor could it have" because he 
was unaware "that the employee with whom I met briefly 
while I was at AFSCME was the same individual." Wasser-
man Decl. pp 4-6.

 II.

 We affirm the FLRA's findings of fact "if supported by 
substantial evidence on the record considered as a whole." 5 
U.S.C. s 7123(c); see also Universal Camera Corp. v. NLRB, 
340 U.S. 474 (1951). We will set aside an FLRA order only if 
it is "arbitrary, capricious, an abuse of discretion, or other-
wise not in accordance with law." 5 U.S.C. ss 7123(c), 
706(2)(A); see also Overseas Educ. Ass'n, Inc. v. FLRA, 858 
F.2d 769, 771-72 (D.C. Cir. 1988).

 Power again advances several arguments, none of which 
has merit. First, we reject both of Power's "protected activi-
ty" claims under the FSLMRS. Pet'r Br. at 18-19. With 
respect to his repeated refusals to provide a writing sample, 
Power's pending grievance "over the exact subject matter for 
which the writing sample was requested," id. at 19, does not 
immunize him from responding to a supervisor's good faith 
request for rating material. Moreover, Power's assertion 
that he merely wished to be judged on his entire body of 
writing over the rating period does not explain his insubordi-
nate behavior in submitting over 2,000 pages of unstapled, 
uncollated pages, many of which were totally irrelevant, 
including other individuals' court filings and LEXIS print-
outs. Power's strained argument--that he was engaged in a 
statutorily "protected activity" by tardily submitting nonre-
sponsive documents in response to his supervisor's repeated 
and legitimate requests for writing samples--is without mer-
it. We also reject Power's claim that his refusal to obey the 
management order to return the computer usage surveys was 


a statutorily "protected activity." We agree with the FLRA 
that "the information was ... PBGC's property that Power 
obtained from an unauthorized source without PBGC's knowl-
edge or consent" and that Power's "first obligation [was] to 
comply with [his] supervisory order[s], reserving any com-
plaints or grievances for a later time." Pension Benefit 
Guar. Corp., 52 F.L.R.A. at 16-17.6

 Power also claims that the FLRA's dismissal of his wrong-
ful termination claim is "arbitrary, irrational, unsupported by 
substantial evidence on the record considered as a whole, and 
is otherwise not in accordance with law." Pet'r Br. at 20. 
Notwithstanding his repeated efforts to re-write the facts of 
this case, characterizing his insubordination as "minor and 
inadvertent" and "mistaken violations of office protocol," id. 
at 40, 32, we have already concluded that Power engaged in 
"many incidents of insubordinate conduct" and "multiple 
types of insubordination." Pension Benefit Guar. Corp., 967 
F.2d at 660, 670. The facts underlying Power's termination 
are the same today as they were when this Court first heard 

__________
 6 Power invokes for support the decision in United States Air 
Force Logistics Command, Tinker Air Force Base, Oklahoma City 
and AFGE, which overturned the management's discipline of a 
union representative who was detained by security officers after 
refusing to leave a work area where he was attempting "to person-
ally serve copies of unfair labor practice charges filed by the Union 
on Activity supervisors who were named in the charges." 34 
F.L.R.A. 385, 386 (1990). We find the decision inapposite because, 
as noted above, Power's insubordinate conduct was neither union-
related nor statutorily protected. Nor was it "grounded" or "root-
ed" in any provision of a collective bargaining agreement. See 
NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 831-32 (1984). 
Moreover, United States Air Force reaffirms "[m]anagement's right 
... to discipline a union representative for activities which 'are not 
specifically on behalf of the exclusive representative or which 
exceed the boundaries of protected activity such as flagrant miscon-
duct.' " Id. at 388-89 (quoting Long Beach Naval Shipyard, Long 
Beach, Calif., 25 F.L.R.A. 1002, 1005 (1987)). Finally, as we have 
repeatedly recognized, "[e]ngaging in union activities does not 
shield an employee from being fired." Avecor, Inc. v. NLRB, 931 
F.2d 924, 928 (D.C. Cir. 1991).
the matter. Now, as then, the FLRA's conclusion that PBGC 
"had a legitimate justification for its action," id. at 666 
(internal quotations omitted), is supported by substantial 
evidence.

 As a result, the question on remand was simply whether 
Power would have been terminated even in the absence of 
protected activity. After comparing Power's circumstances to 
those of other disciplined employees, both the ALJ and the 
FLRA concluded that Power had not been treated disparate-
ly. While Power uses selective facts from the record in an 
attempt to recast his misconduct in a more favorable light, his 
attempts fail to demonstrate that the ALJ's and FLRA's 
findings lack substantial support in the record as a whole. 
Indeed, even if the case were closer, we would nonetheless 
affirm the FLRA because its findings, supported by substan-
tial evidence, "may not be displaced on review even if the 
court might have reached a different result had the matter 
been before it de novo." LCF, Inc. v. NLRB, 129 F.3d 1276, 
1281 (D.C. Cir. 1997) (internal citations omitted).

 Power next argues that the FLRA erroneously adopted 
and applied the factors outlined in Douglas v. Veterans 
Admin., 5 M.S.P.B. 280, 305-06 (1981). Specifically, Power 
contends that the Douglas factors apply only to Merit Sys-
tems Protection Board cases and that the FLRA could not 
adopt those factors as its own because they had been devel-
oped by another administrative body. As we specifically 
noted in Pension Benefit Guar. Corp. v. FLRA, however, "[i]t 
is, of course, for the FLRA to determine in the first instance 
what factors are relevant in deciding whether employees are 
similarly situated." 967 F.2d at 668. We then discussed in 
detail numerous Douglas factors to be considered after de-
claring that "many factors may be relevant in determining an 
appropriate sanction." Id.7

__________
 7 Power also claims that the FLRA erroneously refused to 
consider more "evidence" on remand. We reject this claim as well. 
On remand, the ALJ and the FLRA followed our narrow instruc-
tions, which did not include reopening the entire record. Power has 
had more than a "fair opportunity to develop and present" his case 


 Finally, Power's bias claim regarding FLRA member Was-
serman is meritless. We will set aside an official's decision 
not to recuse "only where he has 'demonstrably made up [his] 
mind about important and specific factual questions and [is] 
impervious to contrary evidence.' " Metropolitan Council of 
NAACP Branches v. FCC, 46 F.3d 1154, 1165 (quoting Unit-
ed Steelworkers of Am. v. Marshall, 647 F.2d 1189, 1209 (D.C. 
Cir. 1980)). No such showing has been made here. Nothing 
in Power's declaration regarding his brief exchange with 
Wasserman suggests--much less establishes--that Wasser-
man had "a fixed opinion--'a closed mind on the merits of the 
case.' " Throckmorton v. NTSB, 963 F.2d 441, 445 (D.C. Cir. 
1992) (quoting United States v. Haldeman, 559 F.2d 31, 136 
(D.C. Cir. 1976)).

 Even if Power's argument had merit, he would be preclud-
ed from raising it now because "[c]laims of bias must 'be 
raised as soon as practicable after a party has reasonable 
cause to believe that grounds for disqualification exist.' " 
Pharaon v. Board of Governors of the Fed. Reserve Sys., 135 
F.3d 148, 155 (D.C. Cir. 1998) (quoting Marcus v. Director, 
Office of Workers' Compensation Programs, 548 F.2d 1044, 
1051 (D.C. Cir. 1976) (footnotes omitted)). Indeed, the Fed-
eral Labor Relations Act provides that "no objection that has 
not been urged before the Authority, or its designee, shall be 
considered by the court, unless the failure or neglect to urge 
the objection is excused because of extraordinary circum-
stances." 5 U.S.C. s 7123(c); see also United States Dep't of 
Commerce v. FLRA, 7 F.3d 243, 245 (D.C. Cir. 1993). It is 
undisputed that Power failed to apprise the FLRA of Wasser-
man's potential bias when Power first became aware of 
Wasserman's participation. At oral argument, Power's coun-
sel conceded that the reason no objection was made was that 

__________
and the "strong public interest in bringing litigation to a close," INS 
v. Abudu, 485 U.S. 94, 107 (1984), was--and is--manifest in this 
matter, which has now been before the ALJ twice, before the 
FLRA three times and before us twice. Moreover, "[r]eopening an 
evidentiary hearing is a matter of agency discretion, and is reserved 
for extraordinary circumstances." Cities of Campbell v. FERC, 770 
F.2d 1180, 1191 (D.C. Cir. 1985) (citation omitted).

Power was "embarrassed" by the episode and hoped for a 
favorable decision, thus obviating the need to reveal how his 
AFSCME employment had ended. We have specifically in-
structed that in similar circumstances:

 [i]t will not do for a claimant to suppress his misgivings 
 [regarding bias] while waiting anxiously to see whether 
 the decision goes in his favor. A contrary rule would 
 only countenance and encourage unacceptable inefficien-
 cy in the administrative process. The APA-mandated 
 procedures afford every party ample opportunity to en-
 force and preserve its due process rights. Under the 
 present circumstances, however, petitioner must be 
 deemed to have waived his claim.

Marcus, 548 F.2d at 1051. We therefore have little difficulty 
concluding both that Power's embarrassment regarding one 
of his workplace conflicts does not constitute an "extraordi-
nary circumstance" justifying his failure to object below, 5 
U.S.C. s 7123(c), and that he "must be deemed to have 
waived his claim" based on his admitted "suppress[ion of] his 
misgivings while waiting anxiously to see whether the deci-
sion [would] go[ ] in his favor," Marcus, 548 F.2d at 1051.8

__________
 8 Power attempts to expand our decision in Jenkins v. Sterlac-
ci, 849 F.2d 627 (D.C. Cir. 1988), claiming that "[i]n fact, Jenkins 
provides in the case of actual bias there can be no waiver of the bias 
claim, and thus Power had no obligation to raise it before the 
Authority." Pet'r Reply Br. at 23. But Jenkins, which involved a 
court-appointed special master, turned on Canon 3.D. of the Code of 
Judicial Conduct, which expressly provides that disqualification for 
personal bias is not waivable for those covered by the Code. As 
noted above, by contrast, Power was expressly bound by statute to 
raise his objection before the FLRA. See 5 U.S.C. s 7123(c); see 
also Administrative Procedure Act s 7(b), 5 U.S.C. s 556(b) ("On 
the filing in good faith of a timely and sufficient affidavit of 
personal bias or other disqualification of a presiding or participating 
employee, the agency shall determine the matter as a part of the 
record and decision in the case.") (emphasis added). Moreover, in 
decisions both preceding and subsequent to Jenkins, we have held 
that in administrative agency proceedings, an actual bias claim can 
be waived. In Pharaon v. Board of Governors of the Fed. Reserve 

 III.

 As did the ALJ and the FLRA below, we conclude that 
Power's termination resulted not from anti-union animus but 
from his "many incidents of ... insubordinate conduct." 
Pension Benefit Guar. Corp., 967 F.2d at 660. Accordingly, 
the petition for review is

Denied. 

__________

Sys., the petitioner claimed that the ALJ was biased, "relying 
chiefly on a statement made by the ALJ" in ruling against him. 
135 F.3d 148, 155 (D.C. Cir. 1998). We held that because the 
petitioner was "[a]ware of the ALJ's alleged bias when he appealed 
the [ALJ's] recommended decision" but "failed to raise the issue or 
argue that the case should be remanded to a different ALJ," he 
"thus waived his principal ground for asserting bias" and could not 
first raise the issue on appeal. Id.; see also Marcus v. Director, 
Office of Workers' Compensation Programs, 548 F.2d 1044, 1051, 
1050 (D.C. Cir. 1976) ("petitioner must be deemed to have waived 
his claim" of ALJ's bias because he "wait[ed] until after the initial 
adverse decision [of the ALJ] to raise the[ ] allegations" that "the 
ALJ 'demonstrated personal bias, religious bias, and bias based 
upon the nativity of appellant' ").