**GRAND RAPIDS DIE CASTING CORPORATION, Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

Nos. 86–5650, 86–5709.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 17, 1987.

Decided Oct. 13, 1987.

Rehearing Denied Nov. 17, 1987.*

Rehearing and Rehearing En Banc Denied Dec. 31, 1987.

* Opinion on rehearing published at 833 F.2d 605.

Charles C. Hawk, William H. Fallon (argued), Miller, Johnson, Snell & Cummiskey, Grand Rapids, Mich., for petitioner, cross-respondent.

Elliott Moore, N.L.R.B., Barbara A. Atkin, Dennis Walsh (argued), Washington, D.C., for respondent, cross-petitioner.

Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.

PER CURIAM.

Grand Rapids Die Casting Corporation petitions for review of a National Labor Relations Board decision adopting the recommendation of an administrative law judge that the Board order reinstatement of a union steward who had been discharged from her employment. The NLRB cross-petitions for enforcement of its order. We shall grant enforcement.

The employee, Sheilla Washington, was one of four union stewards employed at the company's Grand Rapids, Michigan, plating plant. She processed grievances for union employees who worked on the plating line. Ms. Washington worked in the autobuff department, and the union steward who would process any grievance she might have was Thomas Hogan.

After arriving for work at 6:00 a.m. on December 28, 1983, Ms. Washington obtained permission from her foreman, Daryl Hamp, to leave her work station to talk to a plating line employee, Gaida Ancans, about a grievance. Mr. Hamp also gave Ms. Washington permission to meet with Mr. Hogan about a grievance to be filed on her own behalf. By 8:00 a.m. Ms. Washington had discussed her own grievance with Hogan and had returned to work, but had not yet talked to Ms. Ancans. Hamp told Ms. Washington to deal with Ms. Ancans' grievance before taking her morning break.

The investigation of Ms. Ancans' grievance required a check of the plant's front office records, which took over 30 minutes. Upon her return from the front office Ms. Washington was met by Mr. Hamp and Michael Cleland, foreman of the plating line. Plant Manager Clare Johnston soon joined the group. According to Ms. Washington's testimony, Cleland was angry because he thought it should take no more

than 15 minutes to write a grievance. Mr. Johnston ordered Ms. Washington back to work. Mr. Cleland, on the other hand, gave Ms. Washington 15 more minutes to finish her union business. The discussion was a heated one and was punctuated with profanity on the part of the management officials, according to Ms. Washington. (The management officials disputed Ms. Washington's account of the tone and content of the conversation, but this court, of course, is not in a position to judge credibility or resolve conflicts in testimony.) Claiming that she found the swearing and yelling abusive, Ms. Washington requested that she again be allowed to meet her union steward so that yet another grievance could be filed on her behalf. Mr. Cleland said that she should take 15 minutes and write the "damn grievance" and then hurry back to work. Since Mr. Johnston did not countermand this instruction, Ms. Washington assumed that she did not have to return to work immediately.

Ms. Washington began to walk away, remarking to Mr. Hamp that when she had finished talking to her steward she was going to the local NLRB office to file charges because of the abusive treatment. Ms. Washington testified that the plant manager became "really mad" and

> "told me that if I left the shop—to go down to the damn Labor Board—that he would fire me. And he repeated three or four times—if I wanted to be fired. I told him—I had got angry by this time myself. And I told him I didn't care what he did—'cause he was going to do it anyway. And he told me that if I left the shop for any reason that day—that he would fire me."

In response to this Ms. Washington said that she had credits under the company's absenteeism policy that she could use to go to the NLRB office. Her understanding of the policy was that she would only suffer three days off by absenting herself from work.

Because she had not completed her work on the Ancans grievance, Ms. Washington returned to the union office, joining Mr. Hogan there. Hogan's foreman came in, stating he was under orders to punch Hogan out for the day if he did not immediately return to work. Mr. Hogan declined to do so. He completed the preparation of Ms. Washington's grievance and took it to the plant's front office, observing on the way that his time card had already been pulled. Plant Manager Johnston was standing in the reception area of the front office; he said to Hogan, "Tom, I'm going to give you and Sheilla something to go downtown [to the NLRB office] and file charges on now."

Ms. Washington completed her grievance writing before 9:00 a.m. and told Hamp she was ready to return to work, but she wanted to take her morning break first. Mr. Hamp permitted her to take the break. Another employee then told her that her time card had been pulled by Hamp. Ms. Washington approached Hamp and asked why her card had been pulled, but he simply told her to return to the union office.

Industrial Relations Manager Richard Cardinal returned to the plant at about 10:00 a.m. on December 28. On his arrival at the front office he received paperwork on suspensions of Hogan and Washington "pending discharge" for violation of Shop Rule 8, which prohibits insubordination. Both employees were charged with refusing to obey orders to return to work. The notices said that a hearing was scheduled for 9:00 o'clock the following morning. Mr. Cardinal went to the plant manager's office and was told by Johnston, Cleland, and Hamp that the two union stewards had refused to obey return-to-work orders. The Industrial Relations Manager agreed with the decision to suspend the two.

After Ms. Washington and Mr. Hogan had received their "suspension/pending discharge" notices, Johnston walked up to them and said, "Now you people got something to go down to the Labor Board for." This testimony, again, was disputed, but it was credited by the ALJ. Both employees were told that they could not go back into the plant. The two then went to the NLRB office and filed their unfair labor practice charges.

Mr. Cardinal tentatively decided on the evening of December 28 to discharge Washington, this being her second violation of Shop Rule 8. Although he had initially intended simply to impose a disciplinary layoff on Mr. Hogan, who had no prior violation, the latter's responses at the joint suspension hearing held on the morning of December 29 led Cardinal to discharge Hogan as well. The December 29 meeting was very brief, with the union making no serious attempt to discuss the merits of the two cases. Mr. Cardinal subsequently denied that the discharges were influenced by the two employees' union activities or the possibility that they might file charges with the NLRB. The Industrial Relations Manager did not learn that Ms. Washington had filed charges until a day or two later, when copies arrived in the mail.

Ms. Washington filed three grievances with the company, complaining of verbal abuse and protesting that her discharge was improper because it resulted from her union activities and her desire to file charges with the NLRB. The grievances went to arbitration. Following a hearing, the arbitrator decided that there was just cause for the discharge, Ms. Washington having failed promptly to obey a return to work order.

Prior to the arbitrator's decision the Regional Director of the NLRB had filed a consolidated complaint based on Hogan's and Washington's charges. A three-day hearing was held before an ALJ, and in a decision issued six months after the arbitrator's the ALJ found that Ms. Washington had not refused an order to return to work, that her union activities and her announced intention to file a charge with the NLRB caused her discharge, and that Mr. Johnston's December 28 threat to discharge Ms. Washington and the discharge itself violated §§ 8(a)(1), (3) and (4) of the National Labor Relations Act.[1] The NLRB adopted the ALJ's findings, conclusions and recommended order in a brief "Decision and Order" to which the petitions now before us are directed.

\* \* \*

The pertinent provisions of the National Labor Relations Act, as codified at 29 U.S.C. §§ 158(a)(1), (3) and (4), read as follows:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 [§ 7 of the Act] of this title;

. . . . .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter."

We review the Board's findings with respect to questions of fact to determine if they are supported by substantial evidence. 29 U.S.C. § 160(e).

■ As a threshold matter, we do not believe that the Board was required to defer to the arbitrator's conclusion that Ms. Washington's discharge was proper. The NLRB's deference policy balances the Board's responsibility to prevent unfair labor practices against the sometimes opposing objective of encouraging arbitration of labor disputes. *Taylor v. NLRB*, 786 F.2d 1516, 1518 (11th Cir.1986). Although the NLRB standards have shifted toward more frequent deference to arbitral decisions, see *Olin Corp.*, 268 NLRB 573 (1984), the Board has consistently declined to defer in situations involving allegations that § 8(a)(4) has been breached. *International Harvester Company*, 271 NLRB 647 (1984); *Filmation Associates, Inc.*, 227 NLRB 1721 (1977). We only review the NLRB's decisions on deference for abuse of discretion, *NLRB v. Magnetics International, Inc.*, 699 F.2d 806, 812 n. 5 (6th

---

1. Mr. Hogan, however, was found to have disobeyed a return to work order and the ALJ recommended dismissal of that steward's allegations.

Cir.1983), and we will not overturn the Board's continuing judgment that deference is inappropriate when Board processes are implicated.

■ The Corporation argues that even if the Board did not err in deciding against a blanket deference here, the Board was still bound by the arbitrator's factual findings. Assuming this argument was presented to the Board with sufficient precision to permit our review, 29 U.S.C. § 160(e), we remain unpersuaded. Among the circumstances that may justify the Board in refusing to defer to an arbitral award, even where § 8(a)(4) is not involved, is that the arbitrator was not fully apprised of the facts relevant to the unfair labor practice charge. See *Spielberg Manufacturing*, 112 NLRB 1080 (1955); *Olin Corp., supra* (1984). It makes little sense to defer to the arbitrator's specific factual findings where deference overall was refused because of the inadequacy of the factual presentation to the arbitrator.

■ There was substantial evidence supporting the Board's determination that Ms. Washington was threatened with discharge if she filed charges with the NLRB. The ALJ credited Ms. Washington's version of the events, declining to believe the conflicting testimony, and we see no reason to upset that credibility determination. See *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir.1984) (court will not normally disturb credibility assessments of the ALJ). The company attempts to characterize Mr. Johnston's statements as a warning that if Ms. Washington left the plant for any reason on December 28 she would be dismissed, but such statements are to be interpreted in light of the ramifications that would be understood by the employee. *NLRB v. Armstrong Circuit, Inc.*, 462 F.2d 355, 357 (6th Cir.1972). Section 7 of the Act, 29 U.S.C. § 157 has been read to provide employees with the right to file unfair labor practices with the Board. *Vokas Provision Co. v. NLRB*, 796 F.2d 864, 871–72 n. 10 (6th Cir.1986). The ALJ did not err in concluding that Johnston's threat interfered with, restrained, or coerced Ms. Washington in the exercise of that right, and therefore violated § 8(a)(1). 29 U.S.C. § 158(a)(1).

The discharge on December 29 was found to violate §§ 8(a)(1), (3), and (4) because it stemmed both from Ms. Washington's announced intention to file unfair labor practice charges and from her protected union activities. When an employee is discharged for engaging in union activities and the employer " '. . . has no other basis for the discharge, or if the reasons that he proffers are pretextual,' the employer violates section 8(a)(3) and (1) of the Act." *NLRB v. E.I. DuPont De Nemours*, 750 F.2d 524, 529 (6th Cir.1984) (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 398, 103 S.Ct. 2469, 2472, 76 L.Ed.2d 667 (1983)). The processing and filing of grievances, of course, constitute protected conduct. *Magnetics*, 699 F.2d at 813. Section 8(a)(4) has been interpreted by the NLRB as forbidding an employer to discriminate against an employee for announcing an intention to file charges with the Board. *First National Bank & Trust Co.*, 209 NLRB 95, *enforced*, 505 F.2d 729 (3d Cir.1974).[2]

■ The Corporation asserts that the true reason for Ms. Washington's discharge was her refusal to comply with a legitimate order to return to work. Consequently, the

"critical issue is the employer's actual motivation for discharge. Since direct evidence of motivation is difficult to obtain, however, motive may be inferred from the surrounding circumstances. If substantial evidence underlies the ALJ's

---

**2.** This Circuit in the past has read § 8(a)(4) literally and concluded that an employer may discharge an employee for threatening to go to the Board to file charges. *Hoover Design Corporation v. NLRB*, 402 F.2d 987 (6th Cir.1968). However, in light of the intervening Supreme Court pronouncement in *NLRB v. Scrivener*, 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972), *Hoover Design* is not considered to have continued vitality. *NLRB v. Retail Store Employees Union, Local 876*, 570 F.2d 586, 591 n. 5 (6th Cir.), *cert. denied*, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 109 (1978); *Marshall v. Whirlpool Corporation*, 593 F.2d 715, 724 n. 17 (6th Cir.1979), *aff'd*, 445 U.S. 1, 100 S.Ct. 883, 63 L.Ed.2d 154 (1980).

finding of improper motive, this court should enforce even if it would have decided differently on *de novo* review." *NLRB v. Price's Pic–Pac Supermarkets,* 707 F.2d 236, 240 (6th Cir.1983) (citations omitted).

Circumstances such as expressed hostility towards the union and the proximity in time of the protected activity and the discharge may suggest improper motivation. *E.I. DuPont De Nemours,* 750 F.2d at 529. Once a *prima facie* case of improper motivation has been established, the burden shifts to the employer to prove that "the employee would have been fired for permissible reasons even if he had not been involved in activity protected by the National Labor Relations Act...." *NLRB v. Overseas Motor, Inc.,* 721 F.2d 570, 571 (6th Cir.1983).

The events of the morning of December 28 justify the ALJ's finding of improper motivation. According to the testimony credited by the ALJ, both Foreman Cleland and Plant Manager Johnston objected to, and expressed anger at, the method by which Ms. Washington was conducting union business. Mr. Johnston became more angry when Ms. Washington expressed her intention to file charges with the Board. The ALJ did not have to accept the company's claim that Ms. Washington had refused to obey an order to return to work, particularly since Foreman Hamp had issued the notice charging insubordination and had pulled Ms. Washington's time card at about 9:00 a.m., but minutes before had permitted her to take her morning break. Mr. Johnston having said twice that he had given the employees "something ... [to] file charges on now," the ALJ could infer that anti-union animus and hostility to utilization of Board process played a role in the company's actions.

 The ALJ's findings may stand even if Mr. Cardinal had no knowledge of Ms. Washington's union activities or of her stated intent to file charges with the Board. Section 8 of the Act states that the "employer" may not engage in unfair labor practices. 29 U.S.C. § 158(a). "[A]ny person acting as an agent of an employer,

directly or indirectly ..." comes within the definition of that term. 29 U.S.C. § 152(2). Plant Manager Johnston, in particular, clearly qualifies as a "supervisor" under the Act, 29 U.S.C. § 152(11), and the company will be liable for the consequences of his actions. *NLRB v. Dillon Stores,* 643 F.2d 687, 690 n. 2 (10th Cir.1981); *NLRB v. Big Three Industrial Gas & Equipment Co.,* 579 F.2d 304, 309–10 (5th Cir.1978), *cert. denied,* 440 U.S. 960, 99 S.Ct. 1501, 59 L.Ed.2d 773 (1979).

Mr. Cardinal's ignorance of the specifics of the December 28 verbal altercation would not necessarily rule out improper motivation on the company's part. *Pioneer Natural Gas Co. v. NLRB,* 662 F.2d 408 (5th Cir.1981), and *Delchamps, Inc. v. NLRB,* 585 F.2d 91 (5th Cir.1978), are said to require that the management official who actually discharges the employee be aware of the employee's protected activity before the discharge may be found to have been improperly motivated. However, those opinions addressed situations where management officials who did have knowledge of the employee's protected conduct did not influence the adverse employment action. Indeed, *Delchamps* distinguished its refusal to enforce a Board order from an instance "in which a supervisor with such knowledge [of the employee's protected activity] who was not nominally responsible for the firing nevertheless played a significant role in procuring the discharge." *Delchamps,* 585 F.2d at 95.

We have held that

"a supervisor's unlawful, anti-labor motivation in making a false report leading to discharge must be imputed to the Company, even though the officers who actually make the firing decision do not share that animus. Thus, the Company is deemed to possess the unlawful animus." *JMC Transport, Inc. v. NLRB,* 776 F.2d 612, 619 (6th Cir.1985) (citations and footnote omitted).

The present situation is also similar to that in *Boston Mutual Life Insurance Company v. NLRB,* 692 F.2d 169 (1st Cir.1982), where the Court of Appeals for the First Circuit granted enforcement of the Board's

order even though the management official who ultimately fired the complainant was unaware of that employee's union activity. That court was "reluctant to adopt a rule that would permit the company to launder the 'bad' motives of certain of its supervisors by forwarding a dispassionate report to a neutral superior." *Id.* at 171. We share that reluctance. Evidence of improper motivation was presented to the ALJ here, and the existence of a causal relationship between such animus and the discharge could properly have been inferred by the factfinder.

Finally, the company complains it did not receive due process. Although the complaint filed by the Regional Director charged that § 8(a)(4) was violated when the company discharged Ms. Washington because she "had filed charges with and had given testimony to the Board" (Complaint, ¶¶ 14, 17), the ALJ found that the company violated § 8(a)(4) by discharging Ms. Washington for *threatening* to go to the Board. Plant Manager Johnston's actions on December 28 are not included in the complaint's description of the § 8(a)(4) violation. Nevertheless, "Board complaints need not meet the strict particularity in pleading required of indictments, declarations at law, or bills in equity," and we note that a "slight variation between the findings and the complaint does not violate due process" if the acts found can be "fairly comprehended" from the complaint's language. *NLRB v. Scenic Sportswear*, 475 F.2d 1226, 1227 (6th Cir.1973). Since the violation found by the ALJ conformed to Ms. Washington's amended charge, the employer could not have been totally unaware that § 8(a)(4) might be implicated by Mr. Johnston's actions of December 28.

Even if the company was not adequately apprised of the substance of the § 8(a)(4) violation, that would not affect the validity of the ALJ's finding that § 8(a)(3) had been violated, and reinstatement would be proper for that violation alone. Furthermore, the motivation for Ms. Washington's discharge was the focal point of the administrative hearing. The issue before the ALJ was whether Ms. Washington had been fired for an unjustified refusal to return to work, or for reasons illegal under the Act. The company was on notice of the ultimate issue in this case, and that issue was fully litigated.

A judgment order will be entered granting enforcement.