PENSION BENEFIT GUARANTY CORPORATION, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent,

National Treasury Employees Union, Intervenor.

No. 91–1180.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 31, 1992.

Decided June 26, 1992.

James Y. Callear, Washington, D.C., for petitioner.

Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, with whom William E. Persina, Sol., William R. Tobey, Deputy Sol., and Jill A. Griffin, Attorney, Federal Labor Relations Authority, Washington, D.C., were on the brief, for respondent.

Jefferson Friday, of the bar of the District of Columbia Court of Appeals, pro hac vice, by special leave of the court, with whom Gregory O'Duden and Elaine Kaplan, Washington, D.C., were on the brief, for intervenor. Cary P. Sklar and David F. Klein, Washington, D.C., also entered appearances, for intervenor.

Before EDWARDS, SILBERMAN and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

This petition for review involves the decision of the Pension Benefit Guaranty Corporation (PBGC) to terminate David Power, a GS–14 attorney employed in its Office of General Counsel (OGC). Power, who was president of Local Chapter 211 (Local 211) of the National Treasury Employees Union (NTEU) and had frequently represented Local 211 in collective bargaining with PBGC, filed an unfair labor practice charge with the Federal Labor Relations Authority (FLRA) pursuant to 5 U.S.C. § 7116(a). The FLRA concluded that PBGC had committed an unfair labor practice and ordered Power's reinstatement with back pay. The PBGC petitioned for review; the FLRA cross-petitioned for enforcement. We grant PBGC's petition and deny FLRA's cross petition for enforcement of the order.

## I. *Background*

### A. Power's Conduct

By all accounts, Power "was an extremely aggressive union advocate who did not hesitate to challenge management" and had been "highly critical" of two of PBGC's management representatives, R. Frank Tobin, Director of Personnel, and Thomas H. Gabriel, a lawyer under the supervision of PBGC Assistant General Counsel Philip R. Hertz (AGC Hertz). Gabriel provided legal advice to Tobin when needed. *Pension Benefit Guar. Corp.*, 39 F.L.R.A. 905, 962 (1991) (ALJ Decision). There was a "deep seated hostility" between Power and both Gabriel and Tobin. *Id.*

On May 25, 1988, Power received a performance appraisal from his first line supervisor, Lonie Hassel, for the period December 9, 1987, through May 12, 1988. Under PBGC procedures, Power attached comments to the appraisal which was subject to review by then Deputy General Counsel Carol Flowe (DGC Flowe). On June 15, 1988, Flowe, through Assistant General Counsel Jeanne Beck (AGC Beck), Power's intermediate supervisor, asked for "a representative sample of his [Power's] writing." *Id.* at 940. Power responded by stating that some of the documents requested "may be located in the file room of the OGC." *Id.*

The next morning, DGC Flowe dealt directly with Power asking again for a representative sample of his writing. This time Power responded by submitting over 2,100 unstapled pages of "lists of documents,

many pages of court transcripts, letters to Mr. Power from opposing counsel, LEXIS printouts, and balance sheets of companies involved in cases assigned to Power." *Id.* at 941. Flowe, "appalled" at Power's response, returned the papers and sent him a memo asking for the third time for "[a] representative sample" of his writing. *Id.* More than a month later, Power resubmitted the entire stack of over 2100 pages along with a memorandum challenging the validity of the review process and characterizing it as "Alice in Wonderland management of government legal personnel." *Id.* at 942. Flowe returned Power's submission and again requested that Power provide a "representative sample" of his writing. *Id.*

Two and half months later, Power provided Flowe with twenty-five written documents stating, "I disclaim any representations or characterizations of the enclosures as being a 'sample,' or that any such so-called 'sample' is in any way representative." *Id.* Power added that the samples "are not intended to, and in fact do not, have any bearing on what constitutes my 'best' written work during the rating period." *Id.* Flowe "gave up" and improved Power's performance appraisal. *Id.* at 942–43.

This sequence was but one of many incidents of Power's insubordinate conduct. PBGC has independent litigating authority; its Office of General Counsel (OGC) employs some 75 attorneys and has a substantial workload which, at the time of the hearing before the Administrative Law Judge (ALJ) in this matter, included over 600 cases in the bankruptcy courts, 78 cases in the district courts, 11 cases in the circuit courts of appeal and 2 cases in the United States Supreme Court. OGC also drafts regulations and provides advice to other PBGC departments. Because PBGC is a fairly new agency [1] litigating issues of first impression and often revising its positions, OGC uses a "concurrence matrix" to ensure the consistency of its policies. The matrix sets out the requirements for super-

visory approval of written materials originating in OGC and disseminated both to opposing parties in litigation and to other offices within PBGC. Power was well aware of the matrix, having bargained over it as Local 211 president. Nevertheless he repeatedly breached the matrix's requirements.

The first breach involved Power's sending out a promissory note and security agreement to fund trustees, parties in litigation involving PBGC, without AGC Beck's concurrence despite having been told by his previous supervisor, Lonie Hassel, that concurrence was required. AGC Beck reproved Power for doing so and advised him that "[a]ll future agreements and related matters must go through me." *Id.* at 944. Seven days later, however, Power sent a memorandum regarding other litigation to another PBGC department without Beck's concurrence. Beck again admonished Power for his breach of the matrix. *Id.*

Despite these repeated admonitions, three months later, Power sent out two letters to opposing counsel in a third case without following the matrix. He also instructed a clerical worker to ignore the concurrence requirement. One of the letters erroneously stated the amount of the promissory note involved and required a revised letter. Power did not obtain concurrence regarding the revised letter. AGC Beck then sent Power a memorandum which recounted her previous warnings to Power and the importance of obtaining concurrence and termed Power's failure to follow the matrix "inexcusable." *Id.* at 945.

PBGC utilizes a Comprehensive Electronic Office (CEO) mail system to send messages within the agency. The CEO system notes if a recipient deletes a message without reading it. Power repeatedly refused messages sent by AGC Beck, including one scheduling a meeting to discuss the status of Power's cases. *Id.* at 945–46.

---

1. PBGC was created in 1974 by the Employment Retirement Income Security Act of 1974 (ERISA) to administer and enforce the plan termination insurance provisions contained in Title IV of ERISA. *See* 29 U.S.C. § 1302.

During the spring and summer of 1988, NTEU and PBGC engaged in bargaining over office space and ergonomic furniture for PBGC's lawyers. PBGC's computer department had requested that Donald Morrison, a GS–9 Information Service Specialist who acted as OGC's liaison with the department, send out computer usage surveys to all OGC employees. Negotiations reached an impasse on August 23, 1988. That afternoon, Power, who had begun collecting the survey responses from OGC employees because of their usefulness in the bargaining, learned that Morrison was collecting the responses directly on his computer.

Power approached Morrison and asked him if the survey responses were on his computer. Morrison acknowledged that they were but told Power that they were not very reliable. Power asked Morrison for a copy of the survey data. Morrison refused. Later that day, Morrison's printer malfunctioned. Because he was not able to obtain the data printout during his scheduled workday, Morrison asked Power to retrieve the data from the printer and put it on his desk. *Id.* at 947.

The next day, Power returned to the bargaining table with the survey printouts. Morrison's supervisor confronted Morrison, wanting to know how Power obtained the surveys. Morrison lied, claiming that Power's computer had been down the week before, that he had given Power access to his computer and that Power must have used his access code to obtain the surveys. *Id.* at 948.

A month later, on the basis of Morrison's statement, Personnel Director Tobin accused Power of wrongfully obtaining a copy of the surveys. Tobin ordered Power to return the survey data. Power did not do so. Tobin also asked AGC Beck to order Power to return the survey data which Beck did. In the meantime, Morrison admitted to Power that he had lied and corrected his previous statement. Power attached a copy of Morrison's corrected statement to his memorandum responding

to Beck's order. Power further advised Beck that he equated her demand for a "written explanation" to an examination of him at which he was entitled to be represented by a union representative. *Id.* at 950. Beck replied, again ordering Power to return the surveys and disputing Power's right to union representation. Later that day, Power gave Tobin copies of the surveys.

In the meantime, AGC Hertz and his staff lawyer Gabriel conducted an investigatory interview of Morrison to determine which of his two statements was correct and why he had made a false statement. Morrison stated that he was afraid of what might happen if he told the truth. Gabriel asked Morrison if he had any problems with Power in the past. Morrison stated that in July 1986, Morrison had been nominated as executive vice president of Local 211 and that Power had called and asked him why he was running and what his qualifications were. As Morrison explained, Power told him that if he continued to run, "Power would 'cut his nuts off.'" *Id.* at 951. Morrison indicated that he had told two other employees about the incident at the time. The employees, Lillie Connors and Barbara Robinson, corroborated Morrison's story. *Id.* at 951.

Thereafter, PBGC management decided to conduct an investigatory interview of Power to resolve the question of how he had obtained the surveys. Power requested and received a "Kalkines" use immunity.[2] Despite the grant of use immunity, Power refused to respond to many questions, including why he had not provided a written explanation for his failure to return the survey data, where the originals of the survey data were located and whether he had taken the data off premises. Power claimed the questions were either none of management's business or involved internal union matters. *Id.* at 952–53. In response to Beck's questions regarding whether Power had ever threatened Morrison with physical harm, Power first denied

**2.** *See generally Kalkines v. United States,* 200 Ct.Cl. 570, 473 F.2d 1391 (1973) (invalidating employee discharge for refusal to answer questions when investigator failed to advise employee that answers and their fruits could not be used against him in criminal prosecution).

doing so. When Beck specifically asked Power whether he had ever threatened to "cut [Morrison's] nuts off," Power responded that the question dealt with internal union affairs and he would not answer it. *Id.* at 953. When Beck stated that the threat had allegedly been made by one PBGC employee against another at PBGC offices, Power persisted in his refusal to answer. Power dared Beck to discipline him for refusing to cooperate with the interview. Power eventually walked out of the interview, stating he was finished answering questions. *Id.* at 953–54.

Beck then decided that Power should be disciplined. Beck asked AGC Hertz to draft the notice of discipline listing the various incidents supporting disciplinary action but she did not specify an appropriate sanction. Hertz assigned the matter to Gabriel. Beck edited the draft several times to ensure its accuracy.

Power continued his insubordinate conduct by deleting computer messages without reading them and failing to follow the concurrence matrix. Power's conduct led Beck to conclude that discharge was the appropriate discipline. *Id.* at 956. In making her decision, Beck consulted with DGC Flowe and AGC Hertz. Beck also requested additional research on the issues of whether Power was entitled during the interview to refuse to answer questions involving internal union affairs and whether Power's threat to Morrison violated the Landrum Griffin Act.[3] She also requested information on the range of discipline for similar offenses. Before approving the notice, Beck asked Tobin to review it to ensure its consistency with agency policy.

Beck served the notice of removal on Power. Because DGC Flowe was about to be appointed General Counsel, and would thus be the deciding official in the matter, she asked David Lindemann, Director of PBGC's Corporate Policy and Research Group, to reply to Power's oral reply to the charges. Flowe picked Lindemann because he was a lawyer, he was new to the agency and he had no prior dealings with Power. *Id.* at 956–57. Moreover, his department was completely independent of OGC. Power replied, asserting, *inter alia*, that his proposed removal constituted disparate treatment and was therefore improper. Lindemann requested the assistance of two OGC lawyers, Carol Resch and Harold Ashner, in analyzing the issues and preparing a draft recommendation. Lindemann asked Personnel Director Tobin for information regarding the discipline of other employees in view of Power's allegation of disparate treatment. He also spoke with Beck regarding Power's allegations of union animus and inquired if she had lost confidence in Power as a lawyer under her supervision. *Id.* at 957. Lindemann withheld his decision on the appropriate sanction until after the conclusion of the interview and disciplinary process. Lindemann recommended to General Counsel Flowe that Beck's findings be upheld in their entirety and that discharge was the appropriate penalty. Lindemann specifically noted that he had found no evidence that the charges had been filed to retaliate against Power. Flowe reviewed the entire record and upheld the recommendation, after weighing Power's record of service with the agency and his "considerable legal talents" against his "demonstrated lack of judgment and integrity," his "persistent pattern of flouting supervision" and "the need for supervisory review to ensure the consistency of agency decisions," his "disregard for ... [Morrison's] statutory rights," his "com-

---

3. The Landrum Griffin Act guarantees all union members "equal rights ... within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations...." 29 U.S.C. § 411(a)(1). The Act also guarantees all union members "the right to meet and assemble freely with other members" and "to express any views, arguments, or opinions." 29 U.S.C. § 411(a)(2). Section 530 makes it a criminal offense "for any person through the use of force or violence, or threat of the use of force or violence, to restrain, coerce, or intimidate, or attempt to restrain, coerce, or intimidate any member of a labor organization for the purpose of interfering with or preventing the exercise of any right to which he is entitled under the provisions of this chapter." 29 U.S.C. § 530.

plete absence of remorse," and his "insti- gation of other employees to violate estab- lished policies." *Id.* at 958. Flowe con- cluded that Power "was either 'unable or unwilling to conform his behavior to [the] high standard'" of conduct expected of an employee in Power's position. *Id.*

### B. Proceedings Below

NTEU then brought an unfair labor prac- tice charge on Power's behalf alleging that he had been discharged in violation of 5 U.S.C. § 7116(a)(1) and (2)[4] for engaging in protected activity under 5 U.S.C. § 7102.[5] A hearing was held before an ALJ who heard the testimony of Flowe, Beck, Linde- mann, Tobin, Hertz, Gabriel, Morrison, Poll, Adams[6] and Power. The ALJ con- cluded that the FLRA[7] had failed to prove its allegations by a preponderance of the evidence. The ALJ acknowledged "that animosity did exist between Mr. Power and certain management representatives (Tobin and Gabriel) because of the aggressive manner in which [Power] pursued his union ... activities." *Id.* at 964. The ALJ, how- ever, specifically credited the testimony of Beck, Flowe and Lindemann that Power's union activity played no part in the dis- charge decision. He further found that Tobin and Gabriel had only ministerial roles in the firing of Power and "played no part in the actual decision." *Id.* The ALJ fur- ther found that while "many of the indis-

cretions charged to, and admitted by, Mr. Power, standing alone, might well be classi- fied as minor or innocuous in nature, in the aggregate ... they establish a continuing pattern of insubordination." *Id.*

The ALJ also rejected the FLRA's claim of disparate treatment. He determined that most of the disciplinary cases sub- mitted by the FLRA involved different de- ciding officials and different departments and were therefore irrelevant. He also found that the case of the PBGC lawyer who was disciplined by being given a 45 day suspension for engaging in a private law practice on government time did not establish disparate treatment because of the highly unusual circumstances of that case.[8]

The FLRA reversed. While it accepted the ALJ's credibility determinations (based on the testimony of Beck, Flowe and Linde- mann that Power's union activity played no role in the discharge decision), it reversed the ALJ's finding that Tobin and Gabriel had played only ministerial roles in the discharge. The FLRA found that the ALJ had "erroneously focused on the intent of the deciding officials (Beck, Flowe and Lin- demann) and ignored the role ... played by Tobin and Gabriel" in the decision. *Id.* at 923.

The FLRA first found that Gabriel was an active fact-finder based on his role in the questioning of Morrison. Regarding

---

**4.** 5 U.S.C. § 7116(a) provides in pertinent part:
[I]t shall be an unfair labor practice for an agency—
(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment[.]

**5.** 5 U.S.C. § 7102 provides that "[e]ach employ- ee shall have the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal, and each employee shall be protect- ed in the exercise of such right." An employee has the right "to act for a labor organization in the capacity of a representative." 5 U.S.C. § 7102(1).

**6.** Adams was Morrison's supervisor at the time of Power's threat; Poll was Director of the In-

ternal Audit Department and was present at the investigatory interview of Power.

**7.** Under the FLRA's regulations, once it receives an unfair labor practice charge, the Regional Director, on behalf of the General Counsel, in- vestigates the charge. *See* 5 C.F.R. § 2423.7(a). Upon completion of the investigation, the Re- gional Director may issue a complaint initiating a hearing before an ALJ. *See id.* §§ 2423.9 & 2423.12. At the hearing, [t]he General Counsel is responsible for "presenting the evidence in support of the complaint" and "ha[s] the burden of proving the allegations of the complaint by a preponderance of the evidence." *Id.* § 2423.18.

**8.** As the ALJ noted, the then departing general counsel did not want a dismissal to be his last official act and the new general counsel would have had to reinitiate the disciplinary action in order to change it. *Id.* at 960.

the Morrison incident, the FLRA concluded that "Gabriel's pursuit of the matter, in view of the entire context, the staleness of the 'threat,' and the clearly figurative nature of the remark, was itself provocative and indicate[d] that Gabriel was intent on building a case against Power." *Id.* at 924. The FLRA further noted that Gabriel prepared the notice of proposed discipline and that he failed to "include relevant exculpatory information" because, despite his knowledge of the circumstances, he did not note that Morrison had reported Power's threat to Adams at the time of the threat and that Adams had not pursued any disciplinary action. *Id.* at 925.

The FLRA then turned to Tobin's role. It noted that Tobin was the "official responsible for reviewing all employee disciplinary actions for technical accuracy, legal sufficiency," etc. and had reviewed the draft of Beck's notice of proposed removal and Flowe's final determination to discharge Power. *Id.* at 925–26. It noted that Tobin had spoken to Morrison's past supervisor, Adams, regarding the threat incident but had not changed the language of the notice which stated that all of the charged misconduct "had 'either occurred within the recent past or ha[s] been brought to management's attention for the first time during that period.'" *Id.* at 926.

The FLRA analyzed what it termed Tobin's "key role" in Power's discharge—his advice to Lindemann regarding the appropriate penalty. *Id.* After reviewing several instances of allegedly insubordinate employee misconduct, the FLRA found that Tobin had "provided information that was, at best, incomplete and possibly misleading regarding prior discipline of other employees." *Id.* at 927. Specifically, the FLRA found that Tobin described Power's conduct "as a unique circumstance, without any parallel or precedent in the corporation's history" and "did not provide Lindemann with any records of past disciplinary action of other employees or documentation of the progressive discipline that was met-

ed out to employees." *Id.* at 928. The FLRA further found that Lindemann had initially viewed the conduct of the lawyer who had been disciplined for engaging in private practice on government time as "at least of comparable magnitude" to Power's misconduct. *Id.* According to the FLRA, Lindemann had, on the basis of his discussion with Tobin, believed "that removal had been recommended in that situation but the General Counsel had not approved removal." *Id.* In fact, the FLRA declared, the record indicated that removal had never been proposed in that case (despite the ALJ's finding to the contrary). *Id.*

The FLRA concluded that Gabriel and Tobin had played "more than ministerial functions" in the actual decision. *Id.* Based on several decisions of the National Labor Relations Board,[9] including *Grand Rapids Die Casting Corp. v. NLRB*, 831 F.2d 112, 118, *reh'g denied*, 833 F.2d 605 (6th Cir.1987) and *Boston Mut. Life Ins. Co. v. NLRB*, 692 F.2d 169, 171 (1st Cir. 1982), holding that a causal relationship can be inferred when evidence of improper motivation exists and a discharge occurs, the FLRA found "that Tobin and Gabriel's union animus . . . motivated in some part the decision to discharge Power." *Id.* at 930. The FLRA thus found that the General Counsel had established a prima facie case.

The FLRA then considered whether PBGC had rebutted the prima facie case in accordance with its recent decision in *Letterkenny Army Depot*, 35 F.L.R.A. 113 (1990). Under *Letterkenny*, PBGC was required to show "by a preponderance of the evidence that (1) there was a legitimate justification for its action and (2) the same action would have been taken in the absence of protected activity." *Id.* The FLRA conceded that Power had engaged in insubordinate acts but concluded that PBGC had not shown that it would have taken the same action but for Power's union activity.

---

**9.** Because the "structure, role and functions of the Authority were closely patterned after those of the NLRB . . . relevant precedent developed under the NLRA is . . . due serious considera-

tion" by the FLRA and this court. *Library of Congress v. FLRA*, 699 F.2d 1280, 1287 (D.C.Cir. 1983).

In so concluding, the FLRA deemed the misconduct of the lawyer who had engaged in private practice on government time and had lied during an investigation to be "at least comparable" to Power's misconduct. *Id.* at 931. The FLRA also noted that the conduct of other PBGC employees involving physical assaults and obscene gestures had resulted only in suspensions. Finally, it noted that the only PBGC employee who had been discharged had received progressive discipline. The FLRA thus concluded that PBGC had not established "that it would have taken the same action in the absence of Power's union activity." *Id.* The FLRA ordered Power's reinstatement with backpay and all references to his discharge expunged from his files. The PBGC petitioned for review; the FLRA cross-petitioned for enforcement.

## II. *Discussion*

 Our scope of review is limited. We are to affirm the FLRA's findings of fact "if supported by substantial evidence on the record considered as a whole." 5 U.S.C. § 7123(c); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The same scope of review applies when the FLRA reaches a conclusion different from that of its administrative law judge. *General Teamsters Local Union No. 174 v. NLRB*, 723 F.2d 966, 971 (D.C.Cir.1983). We also must defer to the FLRA's construction of its enabling act so long as it is not contrary to congressional intent and is reasonable. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984); *American Fed'n of Gov't Employees, Local 2094 v. FLRA*, 833 F.2d 1037, 1040–41 (D.C.Cir.1987). We may set aside the FLRA's order only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. §§ 7123, 706(2)(A); *Overseas Educ. Ass'n, Inc. v. FLRA*, 858 F.2d 769, 771–72 (D.C.Cir.1988).

### A.

 We first address PBGC's contention that the FLRA lacked jurisdiction to hear Power's complaint. PBGC notes that because Power was a "non-preference eligible" employee under Chapter 75 of the Civil Service Reform Act (CSRA), 5 U.S.C. § 7511(a), he was not entitled to appeal the adverse personnel action, *see* 5 U.S.C. § 7512(1), and thus had no right to seek administrative review by the Merit Systems Protection Board (MSPB) and judicial review by the United States Court of Appeals for the Federal Circuit. *See* 5 U.S.C. §§ 7701, 7703. PBGC relies on *Department of Treasury, Office of Chief Counsel v. FLRA*, 873 F.2d 1467 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1055, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990), which held that, in enacting the CSRA and denying excepted service employees the right to appeal adverse personnel actions, Congress intended to prohibit the FLRA from requiring an agency to bargain over the creation of a grievance procedure to allow excepted service employees to challenge such actions through arbitration. We held so in part because to do otherwise would have allowed excepted service employees to present grievances to arbitrators who were not statutorily bound to apply MSPB precedent,[10] arguably resulting in excepted service employees receiving more favorable treatment than competitive service employees. This result would "thereby invert[ ] the [CSRA]'s preference for" competitive service employees and undermine the Congressional scheme to ensure "MSPB primacy in developing administrative law governing adverse actions against federal employees." 873 F.2d at 1470–71. Relying on this holding, PBGC argues that allowing Power to file an unfair labor practice charge allows him to obtain the very review that Congress denied him thereby undermining CSRA's preference of competitive service employees and the primacy of the MSPB. *Brief of PBGC* at 29–34.

The short answer to PBGC's argument is that Congress, in enacting the Federal La-

---

**10.** Under the proposal, an arbitrator "would be guided by the collective bargaining agreement rather than" 5 U.S.C. § 7701(c). 873 F.2d at 1470 n. 4.

bor Management Relations Act (Act), 5 U.S.C. § 7116(a), provided that it is "an unfair labor practice for an agency ... to interfere with, restrain, or coerce *any employee* in the exercise by the employee of any right under" the Act. (emphasis added). Congress broadly defined the term "employee" as "an individual ... whose employment in an agency has ceased because of any unfair labor practice under section 7116 of this title." 5 U.S.C. § 7103(a)(2). While Congress excluded certain individuals from this definition, *see* 5 U.S.C. § 7103(a)(2)(i)(v), it did not exclude those non-preference eligible excepted service employees to whom it had denied the right to seek MSPB and judicial review of adverse personnel actions under chapter 75 of the CSRA.[11] Nor is there any other indication of congressional intent to deny non-preference eligible employees the right to pursue unfair labor practice charges before the FLRA. Accordingly, we must enforce the statute according to its terms, *Connecticut Nat'l Bank v. Germain,* — U.S. ——, 112 S.Ct. 1146, 117 L.Ed.2d 391, 397–98 (1992); *West Va. Univ. Hosp., Inc. v. Casey,* — U.S. ——, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68 (1991), and conclude that the FLRA's jurisdiction to hear NTEU's unfair labor practice charge is clear.

### B.

■ Under *Letterkenny,* the FLRA General Counsel makes out a prima facie case of discrimination if it shows by a preponderance of the evidence that: "(1) the employee against whom the alleged discriminatory action was taken was engaged in protected activity; and (2) such activity was a motivating factor in the agency's treatment of the employee in connection with hiring, tenure, promotion, or other conditions of employment." 35 F.L.R.A. at 118 (citations omitted). If this showing is made, the agency can rebut it by establishing "by a preponderance of the evidence, that: (1) there was a legitimate justifica-

tion for its action; and (2) the same action would have been taken even in the absence of protected activity." *Id.*

PBGC concedes that, as Local 211 President, Power had often engaged in protected activity including collective bargaining and representation of employees in grievance procedures. *Brief of PBGC* at 34. PBGC, however, challenges the FLRA's finding that union animus tainted Power's discharge because of Tobin's and Gabriel's roles in the discharge. PBGC also challenges the conclusion that it failed to rebut the prima facie case because it did not show that it would have discharged Power in the absence of his protected activity.

PBGC's challenge to the finding that Tobin's and Gabriel's union animus tainted Power's discharge is twofold. First, it challenges the legal basis of the finding of taint, acknowledging that Gabriel and Tobin had a union animus but arguing that their roles in the discharge decision were too insignificant to demonstrate a nexus between their union animus and the discharge decision. PBGC argues that the actual decision makers, Beck, Lindemann and Flowe, did not have a union animus and that Gabriel's and Tobin's union animus cannot be imputed to them because both Beck and Flowe had personal knowledge of Power's misconduct. Second, PBGC challenges FLRA's factual findings regarding Tobin's and Gabriel's roles in the discharge decision, arguing they are not supported by the record.

We need not decide whether the FLRA made out a prima facie case because we believe that PBGC demonstrated that it would have fired Power absent Tobin's and Gabriel's union animus. The FLRA conceded "that Power engaged in insubordinate acts," *see* 39 F.L.R.A. at 930, and implicit in this concession is a recognition that PBGC had a "legitimate justification for its action." *Letterkenny,* 35 F.L.R.A. at 118.

---

11. Congress subsequently enacted the Civil Service Due Process Amendments, Pub.L. No. 101–376, 104 Stat. 461 (1990), to allow non-probationary, non-preference eligible excepted service employees to appeal adverse personnel actions to the MSPB under 5 U.S.C. §§ 7513(d) and 7701(a) and to the Federal Circuit under 5 U.S.C. § 7703. *See* 5 U.S.C. § 7511(a)(1)(C).

This, however, does not end our inquiry. Under *Letterkenny*, PBGC must show it would have discharged Power "even in the absence of protected activity." 35 F.L.R.A. at 118. The FLRA concluded, based on the evidence of PBGC's past disciplinary actions, that Power received disparate treatment as a result of his protected activity. While we are mindful of the deference we owe the FLRA regarding both its findings of fact, *see, e.g., Universal Camera Corp.,* 340 U.S. at 490, 71 S.Ct. at 465; *Internal Revenue Serv. v. FLRA,* 671 F.2d 560, 563 (D.C.Cir.1982), and its construction of statutes it is charged with administering, *see Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782, we cannot uphold the FLRA because, as discussed below, its decision is inadequately explained.

The FLRA concluded "that Power's conduct was not sufficiently distinguishable from the conduct of the other employees to merit the harsher discipline of discharge." 39 F.L.R.A. at 931. It noted the case of employee # 1, a OGC lawyer who engaged in private law practice on government time, made false statements in an official investigation and lied to his supervisor. He received only a 45 day suspension. The FLRA termed this misconduct to be "at least comparable to that of Power." [12] *Id.* The FLRA also noted that other employees who had engaged in physical assaults and obscene verbal threats had only been suspended.[13] The FLRA acknowledged that one other employee, employee # 9, had been discharged but noted that he, unlike Power, had received "progressive discipline." *Id.*

The linchpin of the disparate treatment analysis is the similarly situated status of the employees being compared. *See, e.g., Department of Transp., FAA, El Paso,*

*Tex.,* 39 F.L.R.A. 1542, 1554 (1991) (disparate treatment when employee "treated differently from another similarly situated employee"); *Department of the Navy, Navy Resale Sys., Norfolk, Va.,* 16 F.L.R.A. 257, 263 (1984) (disparate treatment when meat cutter disciplined for safety violation but "almost every other *meat cutter* in the shop" also "chronic[ally] violat[ed] ... the safety standards" without being disciplined) (emphasis added); *Department of Transp., FAA, Boston Air Route Traffic Control Ctr., Nashua, N.H.,* 11 F.L.R.A. 318, 327 (1983) (disparate treatment when employee "single[d] out ... for restrictive treatment while other *similarly situated* employees [we]re engaging in substantially similar conduct") (emphasis added).

We are not convinced that Power and employee # 1 were similarly situated. The record demonstrates that, unlike employee # 1 who had received no warnings before the imposition of the disciplinary sanction, Power had received numerous verbal warnings. Nevertheless, Power continued his insubordinate conduct. Indeed, the record further indicates that even after the investigatory interview, at which time Power had knowledge that his conduct was being closely scrutinized, he continued to refuse to follow the concurrence matrix and he continued to delete CEO messages without reading them. The FLRA's decision ignores this critical difference between employee # 1's conduct and Power's conduct. We thus reject the FLRA's finding that the conduct of employee # 1 and of Power was "at least comparable" as unsupported by substantial evidence on the record as a whole. *See* 5 U.S.C. § 7123(c); *Universal Camera,* 340 U.S. at 490, 71 S.Ct. at 466.

---

**12.** While the ALJ found that this employee would have been discharged but for the fact of the change in officials occupying the general counsel's position, the FLRA rejected the finding, noting that "[t]he relevant inquiry is the actual discipline that was imposed on the employee and not what the agency may have wanted to do in other circumstances." *Id.*

**13.** The ALJ had concluded that this evidence was irrelevant because different officials and

departments were involved in the disciplinary decisions. The FLRA disagreed, noting that "the proper inquiry is an examination of the actions of the employer as a whole and not those of individual officials." J.A. 28 (citing *Department of the Navy, Navy Resale Sys., Norfolk, Virginia,* 16 F.L.R.A. 257, 263 (1984); *Department of Transp., FAA, Boston Air Route Traffic Control Ctr., Nashua, N.H.,* 11 F.L.R.A. 318, 327 (1983)).

We are also troubled by the assumption in the FLRA's analysis that the underlying misconduct of the two employees was the sole factor PBGC considered, or could consider, in imposing a sanction. An employer agency's decision to impose a disciplinary sanction, however, is much more complex. Numerous judicial and administrative precedents as well as administrative regulations recognize that many factors may be relevant in determining an appropriate sanction. *See generally* 5 C.F.R. 731.202(c) (OPM suitability regulations); Federal Personnel Manual, ch. 751, subch. 1–2c (1988); *Webster v. Department of Army*, 911 F.2d 679, 686 (Fed.Cir.1990), *cert. denied,* — U.S. ——, 112 S.Ct. 181, 116 L.Ed.2d 143 (1991); *Nagel v. Department of Health & Human Servs.*, 707 F.2d 1384, 1385–86 (Fed.Cir.1983); *Francisco v. Campbell*, 625 F.2d 266, 269–70 (9th Cir.1980); *Giles v. United States*, 213 Ct.Cl. 602, 553 F.2d 647, 650–51 (1977); *Douglas v. Veterans Admin.*, 5 M.S.P.B. 313, 330–33 (1981). According to the Merit Systems Protection Board, these factors include, *inter alia,* "[t]he nature and seriousness of the offense, and its relation to the employee's duties, positions, and responsibilities"; "the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position"; "the employee's past disciplinary record"; "the employee's past work record, including length of service, performance on the job, and ability to get along with fellow workers, and dependability"; "the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties"; and the employee's "potential for ... rehabilitation." *Douglas*, 5 M.S.P.B. at 332.

Here the record suggests that, in deciding on the appropriate sanctions for employee #1 and for Power, PBGC considered both employee #1's and Power's potential for rehabilitation as well as the effect of their misconduct on their supervisors' confidence in them. *See* Transcript of Hearing 669, 671–72 (testimony of Beck); J.A. 1095–99 (Employee #1—Notice of Proposed Suspension). While the record is not entirely clear as to employee #1's potential for rehabilitation, it does indicate that his supervisors retained sufficient confidence in him to grant him a second chance. *See* J.A. 1099. In contrast, both Beck and Lindemann, two management officials who the FLRA concedes did not have a union animus, testified that Power could not return to the office as an effective employee. *See* Transcript of Hearing 669, 671–672 (testimony of Beck) ("I lost any confidence that [Power] could meet that standard and any confidence that he could function effectively in our office."; "He has never indicated to me any regret or understanding of the seriousness of some of the matters or any willingness to comply."); *id.* at 755–56 (testimony of Lindemann) ("I was convinced, based on my conversation with Jeanne Beck, that the chance for repairing this relationship, establishing confidence and trust, was gone; that it was an irreparable situation and that really, Ms. Beck and the agency had no other choice but to go with removal, and that I would have done the same thing in a comparable situation.").

It is, of course, for the FLRA to determine in the first instance what factors are relevant in deciding whether employees are similarly situated. Nevertheless, the FLRA did not explain those factors in concluding that Power and employee #1 were similarly situated. We therefore conclude that a remand is warranted.

■ We are also troubled by the FLRA's reliance on PBGC's failure to discharge three of its employees (a document control clerk, a supervisory accounting technician and, presumably,[14] an accounting techni-

---

**14.** The record does not clearly identify this employee's position. The employee is identified in General Counsel's exhibit 7(a) as a subordinate of employee #7, who is listed as a supervisory accounting technician. *See* J.A. 1064. While the FLRA's brief refers to this individual as

employee #10, the exhibits it cites discuss the disciplinary action taken against a different employee, #9. *See Brief of FLRA* at 38 (citing GC Exs. 17 and 17(a)); *see also* GC Ex. 17, J.A. 1105; GC Ex. 17(a), J.A. 1119. We infer from the

cian) for physical assaults and obscene gestures in its disparate treatment analysis. While the record is not entirely clear as to their respective grade or level of responsibilities, it does manifest that they were neither lawyers nor OGC employees. *See generally* J.A. 1064–65, 1105–07. As a GS–14 lawyer representing his agency in litigation, Power held a position of special trust. Both *Douglas* and the Federal Personnel Manual recognize that an agency is entitled to examine an employee's grade and responsibilities in determining an appropriate sanction. *See Douglas,* 5 M.S.P.B. at 332; Federal Personnel Manual ch. 751 subch. 1–2c (1988). Indeed, "misconduct which may warrant a reprimand to an employee in a lower grade may be intolerable if it involves an employee in a supervisory or fiduciary position." Federal Personnel Manual ch. 751 subch. 1–2c (1988). In short, these authorities suggest that PBGC may have been entitled to hold Power to a higher standard of conduct than that to which it holds its document control clerks and accounting technicians. The FLRA, however, did not give a reasoned explanation why the three employees were similarly situated to Power and, accordingly, we remand for such an explanation.

Buttressing our conclusion that a remand is warranted is the case of employee # 6, a GM–14 supervisory lawyer who served as an executive assistant to PBGC General Counsel. According to the record, employee # 6 repeatedly dealt directly with PBGC's Office of the Executive Director, urging it to take positions that had not been approved by the General Counsel and were in some instances contrary to the General Counsel's positions. When PBGC directed him either to resign or be removed, employee # 6 resigned.

The FLRA made no mention of employee # 6. *See generally Pension Benefit Guaranty Corp.,* 39 F.L.R.A. at 931–32. At argument, the FLRA attempted to justify the omission by contending that employee # 6 could not be compared to Power because he was a managerial supervisor who was not an "employee" under the Act, *see* 5

U.S.C. § 7103(a)(2), and therefore had no standing to challenge a management action to terminate him. The FLRA also contended that our decisions recognize that a manager can be treated differently from an "employee" under the Act.

Managerial supervisors are treated differently under the Act because they are not "employees" and thus have no right to engage in protected activities. *See* 5 U.S.C. § 7102; *Merit Sys. Protection Bd. v. FLRA,* 913 F.2d 976, 978 (D.C.Cir.1990); *American Fed. of Gov't Employees, Local 1012 v. FLRA,* 841 F.2d 1165, 1167 (D.C.Cir.1988). But it does not necessarily follow that, because managerial supervisors cannot engage in protected activities, they are not similarly situated employees for the purpose of determining whether an employer has discriminated in disciplining an employee. We rejected a similar argument when the FLRA denied a union access to records of the disciplinary sanctions imposed by an agency employer on its supervisors for the same offense committed by unit employees. *See North Germany Area Council, Overseas Educ. Ass'n v. FLRA,* 805 F.2d 1044 (D.C.Cir.1986). In *North Germany Area Council,* we noted that labor arbitrators routinely look at the discipline an employer imposes on its supervisors to determine whether bargaining unit members have been disparately disciplined. 805 F.2d at 1047–48. Because the FLRA had not shown why supervisors' disciplinary sanctions were not relevant in assessing the fairness of the sanctions imposed on bargaining unit employees, we remanded the case. *Id.* at 1049–50. On remand, the FLRA reversed its policy and now requires that an agency employer turn over such information to a union attempting to assess whether one of its members received disparate treatment. *Department of Defense Dependents Schs. v. North Germany Area Council,* 28 F.L.R.A. 202, 205 (1987); *see also Department of Transp., FAA v. National Assoc. of Air Traffic Specialists,* 38 F.L.R.A. 1623 (1991).

We thus question the FLRA's contention at argument that employee # 6 is not comparable. We view his transgressions as

employee's status as a subordinate of employee

# 7 that he was an accounting technician.

"at least comparable" to Power's failure to follow the concurrence matrix. We further note that employee # 6 did not engage in the multiple types of insubordination Power did. That PBGC did not offer employee # 6 a suspension but instead sought his removal may be further evidence that Power did not receive disparate treatment. In any event, the FLRA made no mention of employee # 6, an employee whose situation, we conclude, was in some respects analogous to Power's.[15]

In sum, the FLRA failed to define "similarly situated" in conducting its disparate treatment analysis. We therefore remand for proceedings not inconsistent with this opinion, including the direction that the FLRA consider employee # 6 in conducting its disparate treatment analysis.

*So ordered.*

---

15. We also question the FLRA's attempt to distinguish the case of employee # 8 (mistakenly referred to by the FLRA as employee # 9), a GS–12 auditor discharged for insubordination, on the ground that he, unlike Power, received progressive discipline. Power *did* receive numerous warnings and had more than ample notice that his conduct was unacceptable.